## THE CITY OF READING.

### THE CITY OF DUNDEE.

#### (District Court, E. D. Pennsylvania. August 21, 1900.)

1. COLLISION—IMPROPER ANCHORAGE—FAULT OF PILOT.
   An ocean steamship, brought up the Delaware river to Philadelphia at night by a pilot, and anchored, cannot be held in fault for a collision while at her anchorage because the pilot placed her outside the anchorage grounds set apart by the regulations of the port, which fact was unknown to her officers.

2. PILOTS—NEGLIGENT SERVICE—LIABILITY OF PILOTS' ASSOCIATION.
   The Pilots' Association of the Bay and River Delaware, which is an unincorporated association of pilots, intended to further the interests of its members in various ways, but having no power to make contracts for pilotage service, its members acting individually in that matter, does not stand in the relation of principal as to such contracts, and is not liable for the negligence or fault of one of its members in the performance of a contract for his services.

3. COLLISION—FERRYBOAT AND ANCHORED VESSEL IN FOG.
   Evidence *held* insufficient to establish fault on the part of a steamship anchored in the Delaware river at Philadelphia for a collision between a ferryboat and such vessel in a fog.

In Admiralty. Suit for collision.

John G. Lamb for the City of Reading.

Henry R. Edmunds, for the City of Dundee.

Flanders & Pugh, for Pilots' Association.

McPHERSON, District Judge. This is an action to recover damages for the injury caused by a collision that took place about 7 o'clock in the morning of September 18, 1899, between the ferryboat City of Reading and the steamship City of Dundee. The ferryboat is one of a line that plies upon the Delaware river between the cities of Camden and Philadelphia. On the morning in question the river was covered by a fog so dense that objects could not be distinguished at a distance of a few feet. The boat had safely made one round trip between Camden and Philadelphia, and had returned to Philadelphia upon the second trip. After leaving Camden her course was up the river to a point nearly opposite Chestnut street, and then across to the dock at the foot of that street. Leaving Chestnut street for Camden, her course was down the river close to the Pennsylvania shore until nearly opposite the Allan Line pier, and then across in a southeasterly direction to Kaighn's Point on the New Jersey side. As she crossed and recrossed the river on her first round trip, she heard bells from several vessels at anchor in the stream, but did not know that the City of Dundee was among them,

or was in the berth that she actually occupied. The steamship had come up the river during the previous evening, and had been anchored about 8 o'clock, by the pilot who brought her from the capes, nearly in the middle of the channel, not far above Washington avenue. She was, therefore, close to the course of the ferry from the pier of the Allan Line to Kaighn's Point. As the City of Reading proceeded down the river upon her second trip towards Camden she was blowing her whistle, and was moving at half speed. Her officers—the captain and the second pilot—were properly vigilant, a lookout was on duty, and nothing was left undone by the boat that seemed necessary to guard her safety. She continued down the river until she supposed herself to be at the proper point to change her course,—being guided in part by the ringing of the ferry bell at the slip upon the Camden side,—and then turned across the stream. She heard bells from vessels in her neighborhood, and knew that two or three, at least, were anchored not far away. The officers in charge of the boat believed that the bells were from vessels anchored above her, and, acting upon this belief, continued at half speed in the usual course across the river. The tide was ebb, and, before the boat had gone far, the lookout gave warning that there was something ahead. This proved to be the anchor chain of the Dundee, and almost immediately the bows of the steamship appeared through the fog, but it was then too late to avoid collision. The boat was carried by the ebb tide across the bows of the steamship, and suffered considerable damage.

The charge of negligence is based upon two allegations: First, the steamship is said to have been anchored where she had no right to be; and, second, it is also averred that she failed to give the proper signals, and therefore left the ferryboat in ignorance of her whereabouts. Concerning this second ground there is a good deal of testimony that is in some degree conflicting. On the part of the libelant, it proceeds mainly from persons upon the ferryboat, officers and passengers, who testify that they heard no ringing of bells, or, at all events, no adequate ringing of bells, upon the steamship. This testimony, however, is for the most part negative testimony; and when it is further considered that there is often much difficulty in locating the place from which sound comes in a fog, I have little difficulty in believing the positive testimony of the witnesses called on behalf of the steamship, who declare that she was giving due notice of her position in the stream by ringing proper bells at frequent intervals. I am unable, therefore, to sustain the charge that the steamship was negligent because she failed to give the customary signals. In my opinion,—if it be assumed for the moment that the steamship was not at fault in anchoring where the collision took place,—the injury to the ferryboat was an inevitable accident, for which neither herself nor the steamship should be held liable.

It remains to consider the charge of fault based upon the place of anchorage. It seems clear to me that the steamship should not be held liable for the collision, even if it should be conceded that the injury was caused by anchoring her in an improper place. It is true that her berth was outside of the anchorage ground set apart by the

regulations of the board of port wardens, and I have no doubt that the pilot who brought her from the capes knew these regulations, and also knew that he was anchoring the boat upon a forbidden ground; but I do not think that the steamship can be held liable for this conduct of the pilot, even if it be assumed to have been without sufficient excuse. The officers of the ship knew nothing of these regulations, and they could not be expected to run counter to the pilot's instructions. Whether the pilot himself was at fault under all the facts need not be considered in this proceeding. He is not individually a party, and the question of his blameworthiness is not now material, unless he was the agent of the other respondent, the Pilots' Association, so that his misconduct (if any existed) is to be attributed to his principal. Upon this point I agree with the counsel for the association that the relation of principal and agent did not exist. The pilot is a member of the association, but the association itself has nothing to do with the pilotage of vessels upon the Delaware river. It is an unincorporated society, intended to further the interests of the pilots, and in part to serve as a beneficial association; but it does not attempt to take charge of vessels, nor to conduct them safely between the capes and the city of Philadelphia. In the appropriate language of the brief:

"It is an association inter sese, and its objects are limited to the management of its pilot boats, and the division of the moneys received from its members according to their respective shares as set forth in its rules. It has no power to contract for pilotage service. The pilot offers himself and serves in his individual capacity, and is paid in that capacity. He has no power to bind any or all of his associates; his contracts, his acts of omission or commission, not relating to the purposes of the association. He is not engaged in the business of the association, but is a licensee of the states of Delaware and Pennsylvania, respectively, and governed by the laws of said states, respectively, as to his conduct and acts as a pilot."

I think, therefore, that, as the steamship was not at fault, and as the association was not liable for the conduct of the pilot, no fault has been shown entitling the libelant to recover.

It may, perhaps, be well to add a few words concerning libelant's averment—filed at the argument of the case—that the steamship was negligent in failing to keep an anchor watch. There is very little testimony on this subject, and I think the paucity of evidence is to be charged against the libelant, upon whom the burden of proof rested. Several witnesses from the steamship were examined, but the libelant did not go into this matter, so as to make the point clear. From the meager testimony, however, I am inclined to conclude that a watch was kept by the quartermasters that were on deck, although no watch may have been formally set; but, in any event, I am satisfied that the collision could not have been prevented even if the most vigilant watch had been on duty. The Elk (C. C. A.) 102 Fed. 697. The fog was too dense to permit the eyes to be of service, and the steamship (as I have already found) was giving the only notice possible by ringing her bells.

The libel must be dismissed, with costs.