### THE CITY OF DUNDEE et al.

(Circuit Court of Appeals, Third Circuit. May 8, 1901.)

No. 6.

1. **COLLISION — ANCHORAGE OUTSIDE OF DESIGNATED GROUNDS — NEGLIGENCE.**
   The regulations of the port wardens of Philadelphia, providing that "vessels will be allowed to anchor" in certain designated parts of the Delaware river, are permissive and directory, and, while the defiant or needless disregard of them by a vessel would be evidence of negligence, there may be circumstances under which a ship is justified in anchoring outside of the designated grounds, without being chargeable with negligence, as where, in the judgment of an experienced pilot, they are so fully occupied that a place outside is safer, and other ships are also anchored outside, and in the vicinity of the place selected.

2. **SAME—FERRYBOAT AND ANCHORED STEAMSHIP.**
   Evidence *held* insufficient to establish fault on the part of a steamship anchored in the Delaware river at Philadelphia for a collision caused by a ferryboat striking her in a fog.

3. **PILOTS—NEGLIGENT SERVICE—LIABILITY OF PILOTS' ASSOCIATION**
   The Pilots' Association of the Bay and River Delaware, which is an unincorporated association of pilots, whose objects are limited to the management of pilot boats and the furtherance of the interests of its members in various ways, but which has no power to make contracts for pilotage, its members acting individually in that matter, does not stand in the relation of principal as to such contracts, and is not liable for the negligence or fault of one of its members in the performance of a contract made by him for such service.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

John G. Lamb, for appellant.
Henry R. Edmunds, for the City of Dundee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the district court for the Eastern district of Pennsylvania, in admiralty. 103 Fed. 696. The City of Dundee arrived at Philadelphia about 8 p. m. on September 17, 1899, and, under direction of her pilot, who was a member of the Pilots' Association of the Bay and River Delaware, was anchored at a point near the middle of the Delaware river, above Washington street wharf, Philadelphia, and above Kaighn's Point slip of the Delaware River Ferry Company, on the eastward

or New Jersey side of the river. The place at which the City of Dundee was anchored was outside of and above the anchorage grounds prescribed by the regulations of the board of port wardens of the port of Philadelphia. The night of September 17, 1899, was clear, but a thick fog came up very early on the morning of September 18th. The ferryboat City of Reading started out on her first trip at 5:30 on the morning of September 18th, from Kaighn's Point, Camden, to Chestnut street wharf, Philadelphia. When she left her slip, at 5:30 a. m., the weather was thick, heavy, and foggy. She made one round trip, going up the river from Kaighn's Point, on the eastern side of the river, and crossing to Chestnut street, returning on the western side, and crossing to Kaighn's Point. She then made another trip to Chestnut street, and was returning to Kaighn's Point, when the collision complained of in the libel happened. The fog continued thick, and there is no testimony that those in charge of the City of Reading had seen the City of Dundee, or had any knowledge of her presence in the river. On the trip on which the collision happened, the Reading left Chestnut street slip at 6:46 a. m. The tide was ebb. She was properly officered and manned and equipped. The captain was at the wheel, and the assistant pilot was in the pilot house with him. Two lookouts were stationed forward,—one on the upper deck, in front of the pilot house, and the other on the main deck. When she left the slip, she proceeded down the river on the western side, blowing her whistle frequently, as required by law, and sometimes stopping to locate signals from other vessels. On this trip the fog became very dense, so that it was not possible to see more than 20 feet ahead. There were two steamers and a schooner anchored in the river above the Dundee, and consequently outside the anchorage grounds referred to, the schooner being the vessel next north of the Dundee.

The bells on these vessels seem to have been heard on the Reading by the officers and passengers; none of the witnesses from the Reading, however, saying that they heard any bell or other signal from the Dundee. They also testified that they heard the bell on the Kaighn ferry slip on the New Jersey side, and it appears that the officers were especially listening for that, as they were governed by its sound as to when to starboard the wheel to go across the river. The Reading then stopped to allow the ferryboat America, of the same line, going up the river, to pass her. The America passed the Reading to the eastward. The Reading then started ahead under one bell, and turned to go across the river to her slip at Kaighn's Point. After she had gone ahead under one bell, making a few turns of her paddle wheels, the pilot said he heard a small jingle bell, and at the same time the lookout reported something ahead, and the pilot immediately saw the anchor chain of the Dundee 10 or 15 feet ahead. The Reading was at once stopped and reversed, but the ebb tide threw her across the bow of the Dundee, tearing out her guard, and breaking in the side of the cabin of the Reading. For this damage the master of the Reading libeled the

City of Dundee. The master of the City of Dundee presented his petition to the court, under the fifty-ninth admiralty rule of the supreme court, asking that the Pilots' Association of the Bay and River Delaware might be made parties to the proceedings, which petition was granted. Testimony was taken, and after the hearing the court below dismissed the libel, holding that the charge that the steamship was negligent, because she failed to give the customary signals, was not sustained, and that the steamship should not be held liable for the conduct of the pilot, even if it be conceded that the injury was caused by his having anchored her in an improper place, and without sufficient excuse. The court also held that, as the pilot was not individually a party, the question of his blameworthiness is not material, unless he was the agent of the other respondent,—the pilots' association,—so that his misconduct, if any existed, could be attributed to his principal. But the court also held that, though the pilot was a member of the association, the association itself had nothing to do with the pilotage of vessels upon the Delaware river, but was an unincorporated society, intended to further the interests of the pilots, as a beneficial association, but does not attempt to take charge of vessels, nor to conduct them safely between the capes and the city of Philadelphia, the court concluding its opinion as follows:

"I think, therefore, that as the steamship was not at fault, and as the association was not liable for the conduct of the pilot, no fault has been shown entitling the libelant to recover."

The grounds upon which the City of Dundee is charged by the libelant with liability for the collision, and its consequent damage, are set forth as follows in the libel:

"(1) Because the steamship City of Dundee was anchored at an improper place, and at a place forbidden by the regulations of the board of port wardens of the port of Philadelphia. (2) Because the steamship City of Dundee did not sound a bell or give any other signal to indicate her presence in time to avoid a collision. (3) Because the bell which was rung was not loud enough to be heard at a sufficient distance to avoid a collision."

As to the first ground of liability, we are referred by the libelant to certain regulations adopted by the board of port wardens, April 3, 1899, as to anchorage of vessels at the port of Philadelphia. These, among other things, provide that "vessels will be allowed to anchor in the Delaware river, (a) in the channel between Cooper Point and Petty Island, so as not to interfere with the vessels going to and from Cooper Point; (b) east of lines drawn between" certain buoys thereafter described. Such regulations by such authority are directory and permissive, and may be enforced by the state authority which adopted them, provided they do not interfere improperly or unnecessarily with the free navigability of waters open to interstate and foreign commerce. A defiant or needless disregard of them would constitute an important fact in the consideration of negligence.

It is plain, however, that circumstances may exist which would justify a vessel in anchoring beyond or outside the limits thus pre-

scribed, and which would involve no imputation of negligence in so doing. Assuming that the vessel is liable for the act of her pilot, the facts disclosed by the record, in our opinion, justify the anchorage of the Dundee in the place she was found on the morning of the collision, and outside the anchorage grounds prescribed by the port wardens' regulations, and remove any imputation of negligence that otherwise might be raised as an element in determining the general question of liability. The pilot—one of the most experienced on the Delaware river—testifies, and his testimony is not controverted, that he came up the river with the Dundee and anchored her on Sunday night, the 17th of September, 1899, in the place where she was found the next morning by the City of Reading; that she was anchored, under his direction, in about the middle of the river; that the anchorage was selected because it was the best he could find; that he watched all the way up from Gloucester, and could not see any other place so safe as this; that he came up slowly through the anchorage ground, and stopped often to find a place; that he anchored above the anchorage ground; that a number of other vessels were anchored in that neighborhood; that there were two foreign steamers just above the Dundee, and one four-masted schooner just east of her, and a steamer below, and that the whole anchorage ground was filled up below them; that he had seen the steamers above where he anchored, in their position outside the anchorage grounds, for four or five days; that it was about 8 o'clock when he anchored,—a beautiful moonlight night; that there was no sign of fog during that evening, and that after anchoring the ship he left it, and went to his home, in Philadelphia. The fog came up early the next morning, and created the condition that conduced to the accident. We think this uncontradicted testimony of the pilot is sufficient to negative the first position taken by the libelant, that the Dundee had anchored at an improper and unlawful place.

It becomes necessary, then, to consider the second ground upon which the liability of the steamship is urged; that is, that she "did not sound a bell or give any other signal to indicate her presence in time to avoid a collision." Though no ground of liability is found in the anchoring of the Dundee at the place where the collision occurred, if there were negligence in omitting the proper and usual signals required by the supervening condition of fog on the morning of the 18th, the steamship must be held liable for the consequence of a collision, which, in that case, would be attributable to such negligence as a proximate cause thereof. This liability would be solely that of the Dundee, in the absence of contributory negligence on the part of the City of Reading. The Reading appears, from the testimony, to have left its wharf at Chestnut street, Philadelphia, about 6:46 a. m. The fog which had been prevailing since daylight had not lightened, and it was with difficulty that objects could be seen a few feet ahead of the steamer. She appears to have proceeded slowly down the western side of the river, stopping once or twice at the sound of bells, until a point was reached where the

pilot and those on the lookout heard the Kaighn's Point slip bell, on the opposite side of the river, in such relative position as induced them to starboard the helm, and turn the boat across the river, in the direction of its slip, on the New Jersey side. The pilot, assistant pilot, and lookouts on the Reading testified that they did not hear the bells on the Dundee. So, also, certain of the passengers testified that they heard no bells on the Dundee. They did hear bells on the vessels anchored above the Dundee, on their way down. One of the passengers testified that he was "standing outside, listening for signals, the same as others; saw the City of Dundee before she struck, about ten feet away, loom up so quick, and heard no bell from the Dundee, but heard ferry house bell [on the other side of the river]." The same passenger also testified that, as they passed the steamer lying above the Dundee, he heard her bell, and several of the men on her speak to the men on the Reading about the Dundee being further down the river.

In criticising this testimony of the witnesses who were on the Reading, and who did not hear the bells on the Dundee, it is to be observed that some of them heard no bells after leaving Chestnut street, except the Kaighn's Point bell, while others heard the bells on several of the vessels above the Dundee, and which they passed before coming to her. It is to be noticed that those who heard the bells of the steamers and schooner lying just above the Dundee heard them as they passed them, and the Dundee was still below them, and they were never in the same position relatively to her that they were to the other vessels whose bells they heard.

It is, at all events, apparent that the officers on the Reading, as well as the passengers, were listening, naturally enough, for the Kaighn's Point bell, and had their attention strained in that direction, as by it they were to direct their course across the river. Opposed to this negative testimony is that of the master, first officer, and quartermasters on the Dundee, all of whom testified that the regular bell used in fogs on the bridge amidship was rung at intervals of a minute or oftener, while a steel triangle was hung upon the taffrail at the stern, and was constantly sounded. The captain of the Dundee states that, just before the ferryboat collided, the man was ringing continuously right over his head on the bridge, he being in his cabin. The first officer testifies "that he went on duty at 4 o'clock; that it was not then foggy; that the fog came up at a quarter to 6; that he then started the ringing of the bell; that he stationed a man to keep up ringing every minute, or oftener, if any vessel sounded whistles very close; he did it." He also testifies that, at five minutes of six, he stationed a man at the triangle aft. He says, in answer to the question, "Will you say, under oath, that the bell was ringing in this fog just before the collision, or the time of the collision?" "Yes, sir; I am sure the bell was ringing every half minute. It was oftener than a minute." The quartermasters who were examined all testified to the same effect. The quartermaster stationed at the bell testifies that he was ringing constantly after the fog. He says he heard the whistle from the

Reading, and kept the bell then going almost continuously. So, also, as to the ringing of the triangle. There does not appear to have been any special watch set upon the Dundee. The absence of such a watch might have been a ground for criticism, were it not that it appears from the evidence that about one-half the crew were on deck, variously stationed, and at work, during the time in question. It appears that there were five quartermasters and others of the crew, in all nineteen people, on the deck of the Dundee; one quartermaster specially stationed at the bell, another at the triangle, and the others occupied variously around the deck. It does not appear, therefore, that any greater precaution was necessary than was actually exercised, or that any different result would have occurred had there been a special anchor watch.

But, more than this, there was the testimony of one in no way related to, or interested in, the Dundee,—the mate of the Charing Cross, anchored about 600 feet below the Dundee. He says that he never saw the Dundee before, and has never seen any one connected with her since, the collision. He, in part, testifies as follows:

"Q. Do you remember the City of Dundee being anchored there? A. Yes, sir; I saw her there. Was on deck from 6 to 8 o'clock. Q. Were you ringing your fog bell? A. Yes, sir. Q. Will you say whether or not you heard the City of Dundee ringing her fog bell? A. Yes, sir; the same as our own. Q. You are certain about that, are you? A. Yes, sir. Q. What kind of bell was it? A. Ordinary ship bell. Q. You heard it distinctly, did you? A. Yes, sir. Q. Have you any doubt it was the City of Dundee's fog bell you heard? A. No doubt at all. She was in the same position all the time; she was the closest ship to us. Q. I understood you to say that the direction you heard the Dundee's bell from was just where the Dundee was? A. Yes, sir; all the time."

If those in charge of the Reading were not at fault, the collision was the result of an inevitable accident, for which no legal liability rests anywhere. The court below was clearly right in declining to sustain the charge of negligence on the part of the steamship, in failing to give customary signals.

The third ground of liability, as stated in the libel, is because the bell which was rung was not loud enough to be heard at a sufficient distance to avoid a collision. What we have already said in regard to the negative testimony of those on board the Reading, as contrasted with the positive testimony of those on board the Dundee, will suffice to dispose of this point. The same testimony which supports the allegation that the bell and triangle were continuously and properly sounded establishes the sufficiency of the bell upon the bridge, and also establishes the extra precaution of the triangle upon the stern.

The court was clearly right, also, in its opinion that the libel could not be maintained against the Pilots' Association for the Bay and River Delaware. "It was and is an association inter sese, and its objects are limited to the management of its pilot boats, and the division of the moneys received from its members, according to their respective shares, as set forth in its rules. It has no power to contract for pilotage service. The pilot offers himself and serves

in his individual capacity, and is paid in that capacity. He has no power to bind all or any of his associates; his contracts, his acts of omission and commission, not relating to the purposes of the association. He is not engaged in the business of the association, but is a licensee of the states of Delaware and Pennsylvania respectively, and is governed by the laws of said states as to his conduct and acts as pilot." No contracts of pilotage are made with this association, and no pilot, in conducting a vessel through the bay and river Delaware, is in any wise acting as agent of such association.

It is not necessary that we should pass upon the opinion expressed by the court below, that the steamship could not be held liable for the conduct of the pilot, even if it be conceded that the injury was caused by his having anchored her in an improper place, and without sufficient excuse, but we do not wish that our silence should be taken as sanctioning this proposition.

A careful review of all the evidence convinces us that the decree of the court below, dismissing the libel, was right, and the same is hereby affirmed.