PETERSON et al. v. UNITED NEW YORK
SANDY HOOK PILOTS ASS'N et al.
THE BLACK GULL.
Nos. 14105, 14407.

District Court, E. D. New York.
July 5, 1935.

See, also, 6 F. Supp. 649.

Stefferson & Bourke, of New York City (C. E. Long and Edwin M. Bourke, both of New York City, of counsel), for libelants.

J. Harvey Turnure, of New York City, for United New York Sandy Hook Pilots Ass'n, United New Jersey Sandy Hook, Pilots Ass'n, Harrie Arnold, and Henry M. Clarke.

Hunt, Hill & Betts, of New York City (John W. Crandall and Frank J. Zito, both of New York City, of counsel), for American Diamond Lines, Inc., Black Diamond Steamship Corporation, and the Black Gull.

GALSTON, District Judge.

These libels were on stipulation tried together on the same proofs. The former is an action in personam; the latter a suit brought by the same parties against the Black Gull, in which the American Diamond Lines, Inc., as owner of the vessel, appeared as claimant. An order consolidating the two suits for all purposes was entered at the trial.

Hugh McIntyre, at the time involved herein, was a duly licensed New York Sandy Hook pilot, and was a member of the United New York Sandy Hook Pilots Benevolent Association; Charles M. Peterson and Albert R. Strandberg were members of the crew of the pilot boat Sandy Hook, and were employed by the United New York Sandy Hook Pilots Association and the United New Jersey Sandy Hook Pilots Association, which corporations owned and operated the Sandy Hook. All the capital stock of the United New Jersey Sandy Hook Pilots Association was owned by the United New Jersey Sandy Hook Pilots Benevolent Association, and all of the capital stock of the United New York Sandy Hook Pilots Association was owned by the United New York Sandy Hook Pilots Benevolent Association. The Sandy Hook is owned by the United New York Sandy Hook Pilots Association and the United New Jersey Sandy Hook Pilots Associa-

tion in the respective ratios of seven-tenths and three-tenths.

On the early morning of January 26, 1933, the pilot boat Sandy Hook, which was used for the purpose of putting pilots aboard and taking them from vessels bound in and out of the port of New York, was cruising in the vicinity of the entrance to New York Harbor on the outer pilot station, about a mile to the westward of Ambrose Channel Lightship. The weather was very heavy; a north-east gale was blowing at the rate of 45 miles an hour, together with an easterly swell causing a dangerous breaking cross-sea. The seas in the vicinity of Ambrose Lightship that night were 10 feet high. The range of visibility with the naked eye at 5:15 a. m. in respect to an un-lighted object was about 50 feet, but with the searchlight with which the Sandy Hook was equipped the visibility was es-timated to be about 400 feet. Some time around 5 o'clock the Sandy Hook sighted a steamer which proved to be the Black Gull, heading out to sea in a southeast-erly direction. The Black Gull signaled that the pilot desired to be taken off. The Black Gull then slowed down. The Sandy Hook went around under the Black Gull's stern and came up alongside the starboard side, which was the lee side, proceeding up to the bow of the Black Gull. The Sandy Hook was then stopped in order to put over a yawl. At that time the Sandy Hook was about 170 feet off the Black Gull's bow. The position of the vessel was a mile to the westward of Ambrose Lightship and on a line be-tween that ship and Gedney Channel Whistling Buoy. When the Black Gull stopped to discharge the pilot, she was headed about 135 degrees and had a wind and sea on her port beam. The sea in the lee of the Black Gull was calm.

The yawl from the Sandy Hook was launched from its starboard side. This yawl, so called, is a good-sized row boat about 18 feet in length, propelled by oars. It was manned by Peterson and Strand-berg. These men rowed around the stern of the Sandy Hook, and while under the stern were still in the lee of the Black Gull; the Black Gull having come to a stop. The yawl was observed by Gjoerloff, third mate of the Sandy Hook, who was in charge of that vessel on the occa-sion in question, crossing to the side of the Black Gull. The Black Gull had cluster lights, and Gjoerloff could see the ladder off the side of the Black Gull. As soon as the yawl got alongside of the Black Gull, the Sandy Hook started up her engines, and Gjoerloff turned the wheel hard to make a right-hand turn. In doing so the Sandy Hook started away from the Black Gull. On the comple-tion of this right-hand turn, the Sandy Hook was parallel to the Black Gull, with the latter vessel about a half a mile ahead. During the making of the right-hand turn and proceeding away from the Black Gull, Gjoerloff at no time saw the yawl, nor did he at any time there-after. On the completion of the turn, he observed the Black Gull going ahead. In coming about, the Sandy Hook used her searchlight, turning it towards the Black Gull. Gjoerloff estimated that the time for making the turn was five min-utes. A few minutes after he discovered the Black Gull was proceeding on its way, he heard some noise off the port side of the Sandy Hook. At that time he was in the wheelhouse with Miller. Failing to locate the yawl, Gjoerloff pro-ceeded to make another right-hand turn. This consumed another five minutes. Dur-ing the time he used the searchlight he saw nothing and heard no further noise. The yawl was not sighted. No one from the time the Sandy Hook started on its first right turn was charged with the duty to look out for the yawl.

With weather conditions such as prevailed that night and on the testimony of Gjoerloff that visibility with the naked eye was but 50 feet, it would seem rea-sonably clear that some one should have been delegated to watch for the yawl once the captain determined to make a right-hand turn, which would take him away from the Black Gull and the yawl. That the yawl had the usual equipment of lights, consisting of a candle light, one water light secured in a canvas pocket under one of the yawl's thwarts, and several coston lights stowed in a canvas pocket underneath a thwart, affords no convinc-ing explanation of the failure to station such a lookout.

Moreover, the action of the Sandy Hook in making the first right turn in-stead of standing by and waiting for the return of the yawl is not satisfactorily explained. Gjoerloff says that, had he remained in that position, the Black Gull would have borne down on him, yet any

movement of the Black Gull to leeward, at the time that she stopped, did not prevent the yawl from coming alongside and remaining alongside sufficiently long to permit McIntyre to board her; nor does the explanation take into consideration the obvious circumstance that the Sandy Hook herself would have been driven by the force of the wind to leeward during that same time. However, it was the best judgment of the captain to make the right turn, and his expectation was that the Black Gull would stand by and afford the lee for the yawl. Assuming that he was justified in that expectation and that his decision to make the right turn was a justifiable choice of alternatives, he was not relieved from the necessity, in a perilous condition of wind and sea and scant visibility, of posting a lookout and indeed of using his searchlight throughout the entire maneuver. As has been indicated, the searchlight was used for the first time only after he had made the first turn. It should not be ignored also that, since the yawl made the trip from the Sandy Hook to the Black Gull in a minute and a half, the yawl could in all probability have returned under the lee of the Black Gull in an equal period of time.

The Sandy Hook's search for the missing yawl was interrupted about 6:30 a. m. in order to place a pilot aboard the steamship Leviathan, bound for New York. A pilot could have been placed on the Leviathan from the boat New York instead of from the Sandy Hook.

The yawl finally came ashore at Monmouth Beach, 12 miles off, having been washed ashore about 10 o'clock in the morning. The yawl was first seen by the witness Huband at about 10 o'clock on the morning of January 26, 1933, about a mile offshore, at which time there were three men in it, two rowing and one in the stern. At about 300 feet offshore the yawl overturned, the oars flew out, and it appeared that the yawl overturned on top of the men in the yawl. They were never seen again.

Now to take up with some detail the maneuvers of the Black Gull, it may be stated that her master testified that she was engaged in service between New York and such European ports as Antwerp, Rotterdam, and between coast ports on this side of the Atlantic. The vessel was owned by the American Diamond Lines at the time of the disaster. She is 401 feet in length, has a beam of 54 feet, with gross and net tonnage, respectively, of 5,029 tons and 3,124. The Black Diamond Steamship Corporation is the operating manager for the American Diamond Lines, Inc. On the night of January 26, 1933, she had about 5,000 tons of cargo, and left the pier at 2:22 a. m. from Weehawken. Her draft forward and aft, respectively, was 20 feet 10 inches and 24 feet 8 inches. At that time Frisco, her master, said the weather was blowing a moderate northeasterly gale with some rain. Coming down from the upper bay, Frisco, seeing that the sea was choppy, asked McIntyre whether he would like to take a trip to Europe with him. The invitation was declined by McIntyre. This conversation took place on the upper bridge about 3 a. m. At 4 o'clock the weather was choppier. Frisco testified he said to the pilot:

"'Pilot, this does not look good out here, does it?' He said, 'No.' I said, 'Why don't you go to Antwerp with us?' He said, 'Oh no, no, no, Captain; as far as the sea is concerned it is going to be all right when we stop.'"

Going out of the harbor they first sighted the pilot boat New York which was the inside pilot boat. McIntyre told the mate to signal the New York. These signals were answered by the New York. McIntyre at about this time saw the other pilot boat, the Sandy Hook, and told the captain that he would get into the latter boat. About a mile from the Sandy Hook they hailed her. The Sandy Hook was then bearing two points on the Black Gull's port bow. The speed off Craven Shoal was full ahead. As they approached the outside pilot boat, the speeds, according to the bell book, were as follows: At 4:38 a. m., half speed; at 4:45 a. m., slow speed; at 4:50 a. m., stop; at 4:54 a. m., slow ahead; at 4:56 a. m., stop. The next engine movement indicates that at 4:58 a. m. the pilot was off the vessel.

Frisco testified that to stop his headway completely he remembers going full astern, but that movement is not recorded in the bell book.

Pilot McIntyre was in the wheelhouse as the Black Gull approached the Sandy Hook.

As the yawl was about alongside, Frisco says the men pulled in their oars, the forward man in the boat picked up the boat rope and made it fast. As the boat came alongside, McIntyre was on his way down from the wheelhouse to the forward well deck. It is Frisco's testimony that as McIntyre left the lower bridge he said, "Good-bye captain. Pleasant voyage and go ahead slow." Frisco says that the yawl was alongside the Black Gull for about a minute and a half. He saw McIntyre go down the Jacob's ladder and saw him get into the yawl. Again Frisco testified, quoting McIntyre, that the latter said, as the yawl pushed off and was about 3 or 4 feet from the ship's side, "All clear, captain; go ahead." Frisco says that he saw a light in the yawl held in McIntyre's hand and he continued to see that light until the Sandy Hook made the first turn. His version is that the yawl pulled off at right angles at first to the Black Gull and then drifted toward the starboard quarter. After the yawl left, it was about two or three minutes, said Frisco, before he ordered his engines slow ahead, and accordingly the vessel started ahead at 5 o'clock. Under a slow ahead she went ahead one minute; the next engine movement was half ahead at 5:01, and at 5:04 full ahead. It may be remarked that the tide that night was flood, having a speed of about a knot. Frisco saw the Sandy Hook make a right turn, saw the yawl get around the pilot boat's stern at a time when the stern of the pilot boat was pointed at a 45 degree angle to the Black Gull, and, when Frisco saw the Sandy Hook's red light after the maneuver of the right turn, he put his engine slow ahead. At that time, he says, he saw the light of the yawl. Frisco estimated that, under a slow ahead engine movement, the Black Gull will go about 200 feet in one minute; under half ahead, 600 feet the second minute; and 1,200 feet in the third minute. Under cross-examination Frisco admitted that his usual practice, when pilots leave his ship, is to remain until the yawl is picked up. Frisco also admitted that, though McIntyre had on the two occasions referred to ordered his engines ahead, Frisco did not obey him because he was of opinion that would have been improper.

I cannot attach any considerable weight to Frisco's testimony, for, after advancing those reasons as an explanation of his state of mind, he nevertheless admitted that he disregarded them; also, while asserting that the waves were only 4 feet high, "Q. That isn't any sea at all, is it? A. Not much," he nevertheless on two occasions coming down the bay suggested to McIntyre that he take a trip to Europe with him. Frisco admitted that it would have been improper for the Black Gull to get under way with the Sandy Hook a thousand feet away headed in a northwesterly direction, and not yet showing her red side light. There are significant contradictions between the testimony given by Frisco at the trial and the testimony given in his deposition taken before trial, in respect to the distance the yawl was from the Black Gull when the latter got into motion. In the deposition he testified that, when he put the engines ahead, the yawl was only 150 to 200 feet away, and was still in his lee. Frisco also admitted that it would have been improper for the Black Gull to have got under way as soon as the yawl shoved clear and while still in the Black Gull's lee, if the pilot boat had not completed its round turn and got in a position to take over the Black Gull's lee. It seems obvious that the master of the Black Gull must have realized that the safety of the yawl depended upon the lee to be furnished by the Black Gull until the Sandy Hook could come up to take over that lee. Despite that knowledge on the part of its master, the Black Gull was put to sea and the yawl abandoned before the Sandy Hook came up to take the required position. The engine record of the Black Gull can be interpreted in no other way than as proof, when taken in connection with admissions made by Frisco, that the Black Gull had got under way while the yawl was in an exposed, dangerous position. The testimony of those on the Black Gull is that the pilot left the ship at 4:58 a. m. The yawl, therefore, must have left the Black Gull between 4:58 and 5 a. m., which is the time, according to the Black Gull's log, that the engines of the Black Gull were put slow ahead.

■ Thus it would appear, on Frisco's testimony, unless his estimate of time was wrong, that the Black Gull started ahead as soon as the yawl shoved clear. Indeed, in his deposition he so testified.

The evidence establishes negligence of the Black Gull getting under way before she had reasonable grounds for believing that the yawl was protected from the open seas.

From the foregoing I reach the conclusion that there was fault on the part of both the Black Gull and the Sandy Hook.

Before trial, exceptions were filed to the libels by the American Diamond Lines, Inc., and the Black Diamond Steamship Corporation, on the contention that no cause of action is stated under the Jones Act, § 33, title 46, U. S. C. § 688 (46 USCA § 688), on the ground that McIntyre was not an employee of the Black Gull or her owners or managers. The exceptions were overruled, Peterson v. United New York Sandy Hook Pilots' Association (D. C.) 6 F. Supp. 649, and I see no reason for changing the opinion there expressed.

The two benevolent associations seek to avoid liability on the theory that benevolent associations are not liable for the negligent acts of individual pilots in piloting vessels, citing Guy v. Donald, 203 U. S. 399, 27 S. Ct. 63, 51 L. Ed. 245, The City of Dundee (C. C. A.) 108 F. 679, and The Manchioneal (C. C. A.) 243 F. 801. It is entirely true that these cases support the doctrine that the benevolent associations are not responsible for the negligence of one of their members while in the service of a vessel belonging to a third party, but those cases do not sustain the proposition that in cases in which the vessel is owned by the benevolent association, whether directly or through the ownership of all the stock of the corporation that has legal title to the vessel thus operated, such associations are in position to escape liability for the negligence of the master and crew of such controlled vessels. The Sandy Hook is owned by the two pilot associations, all of the stock of which is owned by the benevolent associations. It is the negligent operation of that boat which is the basis of liability.

The libelants may have a decree in accordance with the foregoing opinion.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.