## IMBROVEK v. HAMBURG–AMERICAN STEAM PACKET CO. et al.

(District Court, D. Maryland. June 27, 1911.)

1. COURTS (§ 96*)—CONTROLLING DECISIONS—DECISIONS OF CIRCUIT COURT OF APPEALS.

The District Court of one judicial circuit will follow the decisions of the Circuit Court of Appeals of another circuit, unless it is in conflict with decisions of the Supreme Court or of the Court of Appeals of the district.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 325, 327, 328; Dec. Dig. § 96.*]

2. CRIMINAL LAW (§ 4*)—CREATION OF OFFENSES—LEGISLATIVE POWER—POWER OF CONGRESS.

The power of Congress conferred by Const. art. 1, § 8, cl. 10, to define and punish felonies committed on the high seas, is independent of any

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

power which it may derive from article 3, § 2, cl. 1, declaring that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction, but that clause gives Congress any power which it may possess to provide for the punishment of offenses committed on any navigable waters other than those of the high seas.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 4.*]

3. ADMIRALTY (§ 18*)—JURISDICTION.

The federal District Courts, given cognizance of all civil cases of admiralty and maritime jurisdiction, have civil jurisdiction over all wrongs committed on waters over which Congress may, by virtue of the admiralty clause of the Constitution, authorize the exercise of criminal jurisdiction.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 206–221; Dec. Dig. § 18.*

Admiralty jurisdiction of torts, see note to Campbell v. H. Hackfeld & Co., 62 C. C. A. 279.]

4. ADMIRALTY (§ 20*)—JURISDICTION.

An action against a contracting stevedore by an employé for injuries while loading a vessel by the negligence of the stevedore is within the jurisdiction of the court of admiralty.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 216, 225, 231; Dec. Dig. § 20.*]

5. MASTER AND SERVANT (§ 278*)—INJURY TO SERVANT—EVIDENCE.

In libel against a contracting stevedore by an employé for injuries received while loading a vessel, evidence held to show the negligence of the stevedore or its agents.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972; Dec. Dig. § 278.*]

6. MASTER AND SERVANT (§ 120*)—INJURY TO SERVANT—NEGLIGENCE.

A contracting stevedore employing one to load a vessel must use due diligence to see that he has a safe place to work; and, where he issues orders to his foreman not to allow men to work under partly covered hatches unless the pins are in, and the instructions are disobeyed, the negligence is that of the foreman.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 211; Dec. Dig. § 120.*]

7. MASTER AND SERVANT (§ 120*)—INJURY TO SERVANT—NEGLIGENCE.

A contracting stevedore employed men to load a vessel. It issued no, general or special orders to its foreman that he was not to allow men to work under partly covered hatches unless the pins were in. The foreman had entire charge of the work, and no other person acted for the stevedore. He never concerned himself about the pins, and issued no orders about them. An employé was injured, and the evidence showed that, if the pins had been in, the accident would not have happened. Held, that the stevedore was guilty of actionable negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 211; Dec. Dig. § 120.*]

8. MASTER AND SERVANT (§ 265*)—INJURY TO SERVANT—NEGLIGENCE OF FELLOW SERVANT—BURDEN OF PROOF.

Where the negligence of a contracting stevedore resulting in injuries to an employé is established, the burden of showing that the negligence of a fellow servant contributed to the accident is on the stevedore.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 265.*]

9. DAMAGES (§ 132*)—PERSONAL INJURIES.

A strong, healthy man 42 years of age was injured. A triangular piece of his skull about 2½ inches on each side was crushed, and the tissues and brain under it were lacerated, and a part of the brain substance exuded. For a time there was a complete paralysis of the right side.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

His leg and arm remained paralyzed to a degree rendering hard physical labor impossible, and the probabilities were that such condition would be permanent. He had a wife and seven children. His average earnings were $10 a week. *Held* to justify an allowance of $4,500.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 178, 372–385; Dec. Dig. § 132.*]

In Admiralty. Action by Frank Imbrovek against the Hamburg-American Steam Packet Company and others. Decree for libelant against defendant the Atlantic Transport Company.

Semmes, Bowen & Semmes, for libelant.
Ralph Robinson, for respondent.

ROSE, District Judge. This is a libel to recover for personal injuries. The libelant is a stevedore. He was injured in the lower hold of the Pretoria. It belonged to the respondent the Hamburg-American Steam Packet Company. The Pretoria, its master, and its owner will all be called the ship. The libelant was working under hatch No. 4. This hatch was when fully uncovered about 30 feet long and 16 wide. The covers were in three sections—the fore, the middle, and the after. The covers had been taken off the middle section. They had been left on the other two. The coverings of the middle section had been piled on top of the fore and after sections. The division of the hatch into sections is made by two movable iron crossbeams, placed athwart the ship. From each crossbeam to the other and from each to the hatch combing opposite ran timbers. They are placed lengthwise of the ship. They are called the fore and afters. On these the hatch covers rest. The libelant and his companions were in the employ of the respondent the Atlantic Transport Company. It will be called the stevedore. The gang were loading and stowing copper. On the dock the copper was piled on a heavy, flat, rope mat. The mat had a bridle on each of two sides. One end of each of these bridles was made fast to a corner of the mat. The bridle passes through a U-shaped iron shackle. These two shackles are placed over a hook at the end of the fall attached to the boom. The mat and contents are lifted by the winch, swung over the hatch and lowered into the hold. The mat is unhooked. The copper is taken out. The shackles are again placed in the hook. The winchman is signaled. The mat is hauled up. On one of its trips up the mat caught under the after crossbeam. The latter was instantly jerked out of its supports. It, the fore and afters resting on it, and the hatch covers supported by them, together with such of the coverings of the middle section of the hatch as had been piled on the after section, fell into the hold. The wood and iron which came down weighed nearly two tons. The libelant was struck. His skull was broken.

There would have been no accident had the entire hatch been uncovered. To uncover a hatch takes time and labor. If bad weather comes, it must be covered. Unnecessary uncovering is to be avoided. It is easy to make a partially covered hatch absolutely safe. The

crossbeams of the hatch have holes in their ends. There are corresponding holes in the hatch combings. Pins can be put through these holes. It takes about five minutes to put them in. When in place, an accident such as gave rise to this case cannot happen. The ship's carpenter of the Pretoria keeps the pins when not in use.

Accidents often happen because an opened hatch has been left unguarded, or because the hatch coverings fall into the hold. When they do, there is usually a dispute as to whether the ship or the stevedore is to blame. In the case at bar the ship and the stevedore were represented by the same proctors and by the same advocates. The stevedore acquits the ship. The libelant and his mates are foreigners. Most of them speak little or no English. He offered no testimony as to the division of responsibility between ship and stevedore. The stevedore proved that, when the ship came into port, it took complete charge of the hatches. It uncovered so much of them as it saw fit. If the pins were in and it wanted them out, it took them out. It laid them on the deck. The ship's carpenter gathered them up. If the pins were out and it wanted them in, it told the ship's carpenter. He put them in.

At the close of the testimony the libel as against the captain and the owner of the ship was necessarily dismissed. The court of its own motion called the attention of the advocates of the respective parties to Campbell v. Hackfeld, 125 Fed. 696, 62 C. C. A. 274. In that case the Circuit Court of Appeals for the Ninth Circuit held that admiralty had no jurisdiction to award damages to the employé of a stevedore for injuries received in consequence of the negligence of his employer. It made no difference that the tort was committed on navigable waters. In the case before me one of libelant's fellow workmen had been killed in the same accident. A libel to recover for his widow and children compensation for his death was by agreement tried with this. When the testimony closed the jurisdiction of this court was still unchallenged. It might have been assailed in the Appellate Court or denied by that court of its own motion. It would then be too late to sue at law. It seemed to be the duty of the court to bring the question of jurisdiction to the notice of the advocates of the libelants. They decided to stand by their libels. The advocates for the stevedore asked leave to amend its answer. Leave was granted. The amendment disputes the jurisdiction of the court.

As the case stands on the pleadings and proofs, the libelant must show (1) that he was injured by the negligence of the respondent; (2) that the court of admiralty has jurisdiction; (3) that his injuries did not result from the negligence of his fellow servants.

Neither of the two last-named defenses would have been open to the ship, if the testimony had shown that it, and not the stevedore, had charge of uncovering the hatches or of making secure the coverings left in place.

The question of jurisdiction must first be considered. Campbell v. Hackfeld was decided in October, 1903. More than four years earlier the same question was raised in this court in the case of Dombroska v. Westoll. At least one thorough and learned brief was submitted

and is still on file among the papers in the case.  That eminent admiralty lawyer, Judge Morris, had no difficulty in disposing of the point.  In view of the language of the Supreme Court and of the inferior admiralty courts and of the expressions of the text-writers, he appears to have thought the jurisdiction too clear for dispute.  He accordingly overruled the exception of the respondent without writing an opinion.

[1] In spite of this earlier decision in this court, it might well be its duty now to conform its rulings to those of the Circuit Court of Appeals of the Ninth Circuit.  It is true that the decisions of that court are not technically binding here.  Nevertheless they should be followed, unless after full consideration they appear to be in conflict with principles clearly settled by the decisions of the Supreme Court or of the Court of Appeals of this circuit.  The Supreme Court has said, "Every species of tort, however occurring and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance."  The Plymouth, 3 Wall. 37, 18 L. Ed. 125.  This language was used 45 years ago.  The Supreme Court has never intimated any dissatisfaction with it.

In The Blackheath, 195 U. S. 368, 25 Sup. Ct. 46, 49 L. Ed. 236, Justice Brown, in concurring with the conclusion of the majority of the court, said he understood that The Plymouth was overruled in so far as it decided that the admiralty had no jurisdiction over injuries done by ships to structures on shore.  He assumed that in future the English statutory rule that the admiralty had jurisdiction of any claims for damages by any ship would prevail.  If he had been right, it would not have followed that the admiralty would not still have had jurisdiction over all torts committed upon navigable water, irrespective of the relation borne by the wrongdoer to a ship.  It would, however, have given an opportunity to argue that, as the rule as to locality had not been held always binding, another would have to be found.  Such rule might then have been sought in the nature of the tort and the relation which it bore to the ship and its navigation.  It turned out that the Supreme Court had not taken the step which Justice Brown supposed it had.  In Cleveland Terminal v. Steamship Co., 208 U. S. 317, 28 Sup. Ct. 414, 52 L. Ed. 508, the court expressly decided that it would follow The Plymouth.

The admiralty, therefore, has no cognizance of any tort, however maritime its nature, unless it becomes effective on navigable water.  The jurisdiction over torts depends on locality, and not on the nature or origin of the wrong done.  That the language of the Supreme Court in The Plymouth literally understood was broad enough to cover the tort in controversy in the case of Campbell v. Hackfeld was admitted.  The Circuit Court of Appeals, however, said that it could not be so understood because, if it was, it would lead much farther than the Supreme Court could possibly have intended to go.  It said "we think it would surprise the Supreme Court to be told" that admiralty had cognizance of the tort committed when Laura D. Fair on board the ferry steamer El Capitan on a voyage from Oakland to San Francisco shot A. P. Crittenden.  There is much reason to sup-

pose that the Supreme Court has repeatedly implied, and sometimes apparently decided, that such a tort as that mentioned is within the jurisdiction of the admiralty. If the Circuit Court of Appeals for the Ninth Circuit is right, the power of Congress to provide for the punishment of offenses committed on navigable waters, other than the high seas, is much more limited than either Congress or the Supreme Court appear ever to have supposed.

[2] The Constitution (article 1, § 8, cl. 10) confers upon Congress the power to define and punish piracies and felonies committed on the high seas. The high seas are the open waters outside the portion surrounded or inclosed between narrow headlands or promontories and without the body of a county of those seas which are in fact free to the navigation of all nations and people on their borders. Within this definition are included the waters of the Great Lakes. United States v. Rodgers, 150 U. S. 255, 14 Sup. Ct. 109, 37 L. Ed. 1071. Within such seas may be included an open roadstead within a marine league of the shore, but at which vessels can safely ride at anchor only in those seasons in which the wind invariably blows from one direction. United States v. Brailsford, 5 Wheat. 184, 5 L. Ed. 64. The right of Congress to define and punish felonies on such waters is entirely independent of any powers which it may derive from the declaration of the Constitution (article 3, § 2, cl. 1) that the judicial power of the United States shall extend to all cases of admiralty and maritime jurisdiction. But it is that clause which gives Congress any power which it may possess to provide for the punishment of offenses committed upon any navigable waters other than those of the high seas. Congress has always assumed that it had such power. In the first crimes act passed in 1790 (Act April 30, 1790, c. 9, 1 Stat. 112), punishment was provided for the crime of manslaughter when committed on the high seas; and for murder when committed either on the high seas or in any river, haven, basin, or bay outside of the jurisdiction of any particular state. The Supreme Court decided that the particular state intended was a state of the American Union, and not a foreign country. United States v. Brailsford, supra. It held that a navigable tidal river in China was not a part of the "high seas." It followed that a person might not lawfully be convicted of manslaughter committed on an American ship on such a river because Congress had not seen fit to attempt to punish it. United States v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37. Justice Story on circuit held that a land-locked bay in the Bermudas was not a part of the high seas. United States v. Robinson, 4 Mason, 307, 27 Fed. Cas. 871, No. 16,176. He made a similar ruling as to outer Boston Bay. United States v. Grush, 5 Mason, 290, 26 Fed. Cas. 48, No. 15,268. Chief Justice Marshall who in U. S. v. Wiltberger, supra, spoke for a unanimous court, did not doubt the power of Congress to legislate on the subject. He pointed out that it had not seen fit to do so. Until it acted the courts could not. He assumed throughout that the sections of the statute which provided for the punishment of murder on waters which were not parts of the high seas was clearly constitutional.

In the previous case of the United States v. Bevans, 3 Wheat. 336, 4 L. Ed. 404, the prisoner had been charged with murder on an American ship in Boston Bay within the jurisdiction of the state of Massachusetts. The Supreme Court through Chief Justice Marshall there said that, assuming the right of Congress under the admiralty clause to provide punishment for offenses committed on navigable waters, whether within or without the jurisdiction of a particular state, Congress had not seen fit to exercise its right. The question was discussed purely as one which turned on what Congress had done. After the decision in United States v. Wiltberger, supra, the crimes act was redrafted by Justice Story. He made it apply throughout, not only to the high seas, but to any arm of the sea or to any river, haven, creek, basin, or bay if within the admiralty jurisdiction, and without the jurisdiction of any particular state. In the case of the United States v. Grush, supra, he expressly said that the admiralty jurisdiction extended over all arms of the sea; that is, over all tidal waters. The states had concurrent jurisdiction over such of them as were within the body of a county. Congress had wisely refrained from legislating as to offenses which could be more conveniently disposed of in the state courts. From that day to this eminent judges and courts have said the same thing, as, for example, Mr. Justice Nelson and Judge Betts in United States v. Wilson, decided in 1856, 3 Blatchf. 435, 28 Fed. Cas. 718, No. 16,731; Judge Wilkins in Miller's Case (1867) Brown's Adm. 156, 17 Fed. Cas. 300, No. 9,558. From time to time Congress had exercised in part, although always sparingly, the power it has thus been told it has.

In United States v. Rodgers, 150 U. S. 255, 14 Sup. Ct. 109, 37 L. Ed. 1071, the prisoner was charged with doing precisely what Laura Fair did; that is, make an assault with a deadly weapon. The only difference was that she shot Crittenden on waters within the jurisdiction of the state of California. Rodgers made his assault upon that part of the Detroit river which is within the jurisdiction of the Dominion of Canada, and therefore without that of any state of the Union. The Detroit river was admittedly not a part of the high seas in any sense of those words. Congress could not legislate as to it under its power to punish felonies on the high seas. No statute made an assault with a deadly weapon punishable when committed on the Detroit river unless it was a river connected with the high seas. The question before the court was whether the Great Lakes were high seas. If they were, Congress had exercised so much of the power resulting from the admiralty clause of the Constitution as was necessary to punish the offense. Otherwise not. The court held that the Great Lakes were high seas. Justices Gray and Brown dissented. They did not question the power of Congress to punish crimes committed on navigable waters. They said Congress had not done so. Justice Brown declared: "I have no doubt whatever of the power of Congress to extend its jurisdiction to crimes committed upon navigable waters." After the case had been tried below and before it was heard above, Congress provided for the punishment of various crimes when committed upon any vessel registered, licensed,

or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes or any of the waters connecting any of said lakes. The Straits of Mackinaw connect Lakes Michigan and Huron. They are within the state of Michigan as much as the Bay of San Francisco is within the state of California. If Congress has the power to provide for the punishment of offenses committed upon the Straits of Mackinaw, it has like power when they are committed upon any other navigable water of the United States. The text-writers all say or assume that Congress has such power. As an illustration, see one of the earliest and one of the latest, 2 Story on the Constitution, §§ 1665, 1669; 2 Willoughby on the Constitution, §§ 646, 647. Nowhere has it been suggested that this power to punish crimes is limited to persons or offenses who or which bear any special relation to the ship upon which the deed is done. Congress may make all crimes committed in places within the admiralty jurisdiction punishable in the federal courts. It never has provided for the punishment therein of more than an insignificant proportion. It may safely be assumed that it never will.

[3] It has, however, given the District Courts cognizance of *all* civil cases of admiralty and maritime jurisdiction. It follows that those courts on the civil side have now jurisdiction over all wrongs committed upon waters over which Congress could by virtue of the admiralty clause of the Constitution authorize the exercise of criminal jurisdiction. One text-writer suggests that the civil jurisdiction of courts of admiralty now in matters of tort is less extensive than the potential jurisdiction of Congress over crimes appears to be. Benedict on Admiralty, after stating the rule in the usual form, adds:

"It may, however, be doubted whether the civil jurisdiction in such cases of torts does not depend upon the relation of the parties to a ship or vessel, embracing only those tortious violations of maritime right and duty which occur in vessels, to which the admiralty jurisdiction, in cases of contracts, applies. If one of several landsmen bathing in the sea should assault or imprison or rob another, it has not been held here that the admiralty would have jurisdiction of the action for the tort." Benedict's Admiralty (3d Ed.) § 308.

The point is not further argued. The rule by which the civil jurisdiction may be confined in narrower limits than that over which the criminal jurisdiction extends is not stated. The case supposed of one landsman robbing another while bathing is an extreme one. It is not likely that courts of admiralty will ever be troubled with many suits to recover damages for such injuries. Plaintiffs are more likely to seek smart money from a jury. If a case of that nature once in a while found its way into a court of admiralty, no great harm would be done. Unnecessarily to introduce into simple and easily understood rules of jurisdiction exceptions which in their nature are hard to define accurately is always costly. Mistakes as to whether jurisdiction does or does not exist inevitably cause denials of justice. Such a case as that which Benedict gives as an illustration of a tort not cognizable in the admiralty has no connection whatever with a ship, not even that of locality. It may perhaps be that a tort com-

mitted on navigable waters, but not on a ship and not connected with a ship, or in any direct way affecting a ship, may not be redressed in the admiralty. Such, however, is not the case at bar.

[4] The tort complained of occurred on navigable waters and on board of a ship. The parties to it were engaged at the time in work absolutely essential to the business of the ship in navigating the seas. The tort alleged is the failure of one of them to use due care in protecting the other from the dangers of that work. It would seem that such a tort is clearly maritime. If maritime, it is in any event and under any general theory of jurisdiction within the cognizance of a court of admiralty.

If the custom of the port had required the ship's carpenter to put in the pins of his own motion, there would be no doubt that the libelant could have redress in the admiralty. It would be hard to explain to any layman why he could not merely because the ship's carpenter was not expected to put in the pins until the boss stevedore told him to do so. There are arbitrary distinctions in all departments of the law. There always will be. There are some in the admiralty. There is no reason to add unnecessarily to their number. The contract of the stevedore with the ship is unquestionably maritime. Norwegian S. S. Co. v. Washington (Fifth Circuit) 57 Fed. 224, 6 C. C. A. 313; The Maine (Fifth Circuit) 51 Fed. 954, 2 C. C. A. 569; The John Shay (D. C.) 81 Fed. 216. If the Supreme Court and many other American courts and text-writers have been in error in saying that admiralty has jurisdiction over torts of whatever nature when committed on navigable waters, as the Circuit Court of Appeals for the Ninth Circuit thinks, it does not follow that admiralty has not jurisdiction over the case at bar.

The particular tort here complained of is maritime within any but the narrowest definition of that term. It appears to be true, as the Circuit Court of Appeals for the Ninth Circuit points out, that there are no cases in the books of recoveries or attempted recoveries in admiralty by working stevedores against boss stevedores for injuries suffered in the course of their work on shipboard in consequence of the negligence of their employers. The circumstance is not without its weight. It must be borne in mind, however, that, when the boss stevedore was pecuniarily worth suing, he could be conveniently sued in the state courts. Most lawyers who make a specialty of personal injury cases prefer to try them before juries. There may be a number of cases in the District Courts, as there has been at least one in Maryland, in which the jurisdiction seemed to the judge so clear as not to justify an opinion. The Circuit Court of Appeals for the Ninth Circuit relies largely on the opinion of Lord Esher in Reg. v. Judge of the City of London Court, L. R. I. Q. B. Div. 1892, 273. It is an able and learned deliverance. The statute and precedents of the English admiralty with which he was concerned, are markedly different from the accepted doctrines of our courts of admiralty. Much which he says is admittedly irrelevant here. He points out that American decisions on questions of the jurisdiction of admiralty are largely inapplicable there. What he decided was

that admiralty has no jurisdiction to entertain a libel against a pilot for damages resulting from his negligent handling of a ship. Such is not the law in this country. In the case of Donald v. Guy (D. C.) 127 Fed. 228, the District Court for the Eastern District of Virginia assumed jurisdiction in admiralty over a libel filed by the owners of a steamer against one Guy and 26 associates who composed the Virginia Pilot Association. Guy was a licensed Virginia pilot, and was in charge of the steamer at the time it came into collision with a schooner. The steamer was held in fault and compelled to make good to the schooner its damage. It was alleged that the negligence for which the steamer had been held responsible was the negligence of Guy. It was contended that the other 26 members of the Virginia Pilot Association were his partners in the business of pilotage, and were jointly liable with him. The question was greatly discussed as to whether the 26 pilots, who were not themselves negligent, were liable. The District Court reached the conclusion that they were. See, also, the same case (D. C.) 135 Fed. 429. When the case came to the Circuit Court of Appeals for the Fourth Circuit, it certified the question as to whether the other 26 pilots were or were not liable to the Supreme Court of the United States. That court in Guy v. Donald, 203 U. S. 399, 27 Sup. Ct. 63, 51 L. Ed. 245, held that they were not. Not once anywhere in any of the three courts through which the case passed does it appear that any one raised the question of jurisdiction. It seemed to the able admiralty lawyers employed in that case, and to the experienced judges who heard it, too clear for question. Nor did the question of jurisdiction suggest itself to the Circuit Court of Appeals for the Third Circuit in the case of the City of Dundee, 108 Fed. 679, 47 C. C. A. 581. All the above-mentioned courts took it for granted that a libel in personam would lie against a pilot who was personally negligent in navigating a ship to recover for the injury resulting from such negligence. The earliest of these cases was decided a number of years after Lord Esher's opinion was published. Most of them were subsequent to the case of Campbell v. Hackfeld. For the reasons above stated, the objection of the respondent to the jurisdiction will be overruled.

[5] Was the libelant injured as a result of the negligence of the stevedore or of its agents or servants? If the pins had been in, he would not have been hurt. As I saw and heard the evidence, I was convinced that so soon as the accident happened every one except the laborers themselves thought of the pins. The promptness with which they came into everybody's mind is convincing evidence that one of their recognized uses was to render such accidents impossible. According to the testimony of the stevedore's own witness, it would not have taken more than five minutes to put them in. It was negligence to omit so simple and well-understood a precaution; the possibilities of accidents otherwise being so obvious. The fact, as testified to, that this particular stevedore had never before had a similar accident, means little. No one attempted to say how often the work had been carried on under like conditions without the pins being in place. Even if that had been frequently done, it would have tended to show

that the stevedore had been fortunate rather than prudent. The stevedore says that, if there was any negligence, it was the negligence of a fellow servant of the libelant, and for that it is not responsible. It admits that the duty to provide a safe place in, which to do the work is one which cannot be delegated, but it points out that the duty is one of construction or provision, and not of operation. It says that the pins were provided. If they were not used, it was the fault of the gang boss. The gang boss, it says, was a fellow servant of the libelant. It does not seem important to determine whether he was or was not. In view of the complete control of the work which he was allowed to exercise if he chose, of his power to employ and discharge the men under him, of the lack of any attempt at supervision over him, it seems probable that he was a vice-principal. It is not necessary so to decide.

[6] The stevedore was bound to use due diligence to see that the libelant had a safe place in which to work. If it had issued orders to its foremen or gang bosses that they were not to allow the men to work under partly covered hatches unless the pins were in, then, if those instructions were disobeyed, the negligence would be the negligence of the gang boss. If the gang boss was the fellow servant of the libelant, the latter might not be entitled to recover.

[7] There is no evidence that any such orders, whether general or special, were ever issued. The stevedore's sole witness, Barttholl, appears to have had entire charge of the work of loading and unloading. He at least appears to have occupied the position of vice principal. The testimony at all events does not show what other human being acted for the corporate respondent. He admits that he never concerned himself about the pins. He did not look to see whether they were in or out. He issued no orders about them. It is evident from his testimony that the stevedore did not give a thought to them. In failing so to do it neglected a duty which it owed to the libelant and his mates. The stevedore admits in its brief that there is no question of contributory negligence in the case. The witness Barttholl, who was not present, says that the accident never could have happened had the mat been properly hooked on. I am not satisfied that he is correct in this. It seems quite possible that there were conditions in which the mat might have caught had the shackles been properly hooked. There is no evidence that they were not, except this witness' opinion that, if they had been, the mat could not have pulled the crossbeam out of place. Two eyewitnesses swear that the mat was hooked on.

[8] The negligence of the stevedore being established, the burden of showing that the negligence of a fellow servant of the libelant contributed to the accident is on it. In my judgment that burden has not been sustained.

[9] The libelant was terribly injured. A triangular piece of his skull, about two or two and a half inches on each side, was crushed. The tissues and brain under it were lacerated. A part of the brain substance exuded. His life was saved. For a while there was a

complete paralysis of the right side. His condition has improved somewhat. His leg and arm, however, are still paralyzed to a degree to render hard physical labor impossible. It is the only kind of labor to which he ever was trained. The disinterested physicians from the public hospital to which he was taken after the accident say that the probabilities are that his right arm and leg will remain permanently as they now are. He was a strong, healthy man, 42 years of age. He has a wife and seven children. He probably averaged earnings of about $10 a week. An allowance of $4,500 to him will be moderate and reasonable. I will enter a decree in his favor against the Atlantic Transport Company for that amount.