## THE ALABAMA.

### (Circuit Court of Appeals, Fifth Circuit. April 26, 1917.)

### No. 3004.

1. ADMIRALTY ⊜⇒34—SUIT AGAINST VESSEL—LACHES.

A party having a cause of action against a ship should not be penalized for undertaking to settle his claim amicably, and a libelant will not be held barred by laches, where at the only time the vessel came within the jurisdiction, prior to the one when the libel was filed, which was known, or could have been known by the exercise of reasonable diligence, by him or his counsel, they were awaiting an answer to a letter presenting his claim, but the vessel left port the next day without answering.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 316–321.]

2. SHIPPING ⊜⇒86(2)—LIABILITY OF VESSEL—INJURY TO STEVEDORE.

Evidence considered, and held to sustain the allegations of a libel that respondent ship, which he was assisting to load as a longshoreman, had no ladder in No. 1 hold, where he and others were directed to work, but that it was necessary to go down by stepping on shifting boards placed there by the ship, one of which turned, causing him to fall and receive

injuries; and such evidence *held* to entitle him to recover on the ground of the negligence of the ship in failing to provide a ladder.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 356, 357.]

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit in admiralty by Frank Howard against the steamship Alabama, as to which Holdt & Isaachsen were claimants, and others. Decree for respondents, and libelant appeals. Reversed.

Richard B. Montgomery, of New Orleans, La., for appellant.

William Grant and William B. Grant, both of New Orleans, La., for appellees.

Before PARDEE, WALKER, and BATTS, Circuit Judges.

BATTS, Circuit Judge. Appellant, Frank Howard, libeled the steamship Alabama for personal injuries. The libel charges that libelant was engaged as a stevedore in loading the steamship at New Orleans; that he started to go down into hatch No. 1, to prepare for work therein; that there was no ladder descending into this hatch, but there was a handhold just below the deck, and below the handhold uneven ends of boards, jutting out from the partition running lengthwise through the middle of the ship; that this was the usual and customary way held out by the owners and masters of the vessel for stevedores to go into the hold, and the one which they had to use. It is further alleged that on this morning, when libelant started to go down into the hatch for the first time, the protruding planks, without any fault or negligence on his part, twisted and gave way, the libelant falling to the bottom of the hold, some 20 feet, breaking his arm and being otherwise injured and bruised.

[1] The accident occurred August 8, 1906. The libel was filed December 17, 1913. Notwithstanding the long period intervening, libelant is not chargeable with laches. Immediately after the accident he was taken to the Charity Hospital. As soon as he could get out, in October, 1906, he employed an attorney. The attorney, understanding that the ship belonged to, or had been chartered by, the United Fruit Company, wrote a letter to the ship, care of that company. Not receiving a reply, and having learned that the vessel would be in the port of New Orleans on November 13, 1906, he again wrote, notifying the ship of the claim, and asking for a settlement. The vessel came into port on that day, and did not leave until the next day. No reply to this letter was received. After the accident the vessel arrived at the port of New Orleans and departed as follows: Arrived September 30, 1906, departed October 2d; arrived October 16th, departed October 17th; arrived November 13th, departed November 14th. In the years 1907, 1908, 1909, and 1910 she was not in port. On May 6, 1911, she arrived and departed on May 8th; May 24, 1911, she arrived, and departed on May 25th. She was not in New Orleans in 1912. She arrived in port on December 16, 1913, and she was libeled on December 17, 1913. The dates are from the journal of the Alabama. The records of the treasurer's department at New Orleans show the arrival and departure of the vessel; October 1, 1906; Octo-

ber 16, 1906; May 6, 1911, and May 24, 1911. The publication in the Times-Democrat of the arrival September 30, 1906, was October 1, 1906, the day of the departure. There was no publication of the arrival October 16, 1906. The arrival of November 13, 1906, was published the same day. The arrival of May 6, 1911, and departure May 8, 1911, were not published in the Times-Democrat. The arrival of May 24, 1911, was published only once, on May 24th. Of the arrivals after November 13, 1906, until December 16, 1913, neither libelant nor his attorney had knowledge until after the departures.

The libel could have been filed November 13, 1906. Instead of taking this action, libelant's attorney wrote a letter, setting up the facts as they have been proved. There was no subsequent opportunity until the ship was libeled in 1913. A party with a cause of action against a ship should not be penalized for undertaking to settle his claim amicably. It is suggested that the delay has been detrimental to respondents in the matter of procuring witnesses. Doubtless the necessary facts could have been easily ascertained, and the necessary witnesses easily procured, at the time the vessel received the letter stating the claim. A little regard at that time for the rights of others, and a little courtesy to one representing those rights, would probably have been profitable.

[2] Under the facts as developed, libelant is entitled to recover, if hold No. 1 was not equipped with a ladder, and if his allegations as to the character of the equipment provided by the ship for descending into the hold are true. The trial judge refers to the testimony of libelant and two other stevedores, to the effect that the hatch was not equipped with the usual ladder, and says:

"As against this is the testimony of Eaton, who was foreman of the longshoremen at the time the accident occurred; and he says that the hatch was equipped with a ladder, and that he used it several times in going in and out of the hold."

And it is suggested that:

"Under the circumstances, particularly as it agrees with the probabilities of the case, the positive testimony of Eaton that the hatch was equipped with a ladder is sufficient to offset the testimony of the other witnesses to the contrary."

Excerpts from the testimony of the witnesses should carry conviction of the truth of libelant's allegations as to this matter. Libelant testified as follows:

"The day before that we had worked in No. 2 [hold]. We filled the lower hold, and we were ordered to No. 1 hatch, and I went down to change my clothes for work, and, in going down, the hatch had no ladders, but only had one handhold, and then you had to go down on the shifting boards, and the shifting boards gave way with me, and I lost my balance and down I went. Q. You say there was no ladder in that hold? A. There was no ladder in that hatch at all. You had to work your way down on the shifting boards. Q. What do you call the shifting boards? A. Just like there was two stanchions here, and the boards were in between, you know. Q. The boards were in between the two stanchions? A. Yes, sir. Now the same was in No. 2, in the lower hold, but they were stationary; they didn't give; they stayed right there, and I went down all right, but never being in No. 1 before, I thought it was all right too, but when I started down it gave way with me,.

and I lost my balance and down I went. Q. Was there any other way to go down into that hatch? A. That was the only way you could go down into the ship in that hatch. * * * Q. Did everybody go down that way? A. That was the only way to go down. * * * Q. Now, who ordered you to go down into that hold that day? A. The foreman, Jack Eaton; he was Mr. Legeai's foreman at that time—Jack Eaton. Q. Was there any other way to go down into the bottom of that ship? A. There was no other way, but that way. There was no other way to go down in No. 1 hold, but the way I went; that was the only way to go down in the ship. Q. What means of getting down were there in hatch No. 2? A. Hatch No. 2 had ladders on the upper deck, but in the lower hold you had to go down on shifting boards, the same way; but they were stationary, they did not give with you, and I went down there all right. They had ladders in No. 2 on the upper deck, but in the lower hold they had no ladders at all in No. 2. Q. But in No. 1 hatch they had no ladders at all on either deck? A. No, sir; there were no ladders at all; there was only a handhold, and you had to work your way down on shifting boards."

## Cross-examined by Mr. Grant, libelant was asked the question:

"Had you ever been down a ladder like this before? A. There was no ladder there. * * * Q. Did they have a ladder on the upper deck in No. 1? A. No, sir. Q. How did the rest of these men go down? A. They went right down the same way I did."

## Edward Gaither testified:

"Q. What means did they have for the workmen to get down in No. 1 hatch? A. They didn't have any at all, hardly but one step. Q. What do you mean by one step? A. The one you first put your foot on as you go over the hatch. Q. And after that? A. After you go down on that piece—get your foot on that piece—you hold to the combing of the hatch, that is, the top of the hatch, and then you would feel your way down with your foot for the running board. * * * Q. What do you call the running board? A. It is the boards that run right on through; and I suppose where he put his foot on turned with him, and that made him fall. Q. Do the running boards extend out in the hold? A. Yes, sir; they extend far enough for you to put your foot on them. Some of them do and some of them do not. Q. Was there any other way provided for the men to go down in that hatch? A. No, sir; there was no other way. * * *"

## The testimony of Octave Lucien was given April 25, 1916:

"Q. What happened at that time? A. Well, Frank, he was going down in the ship at hatch No. 1, and he was going down on a batten, slats that run across—going down on the slats, and the whole slats gave way with him, and he dropped on right down in the hold and broke his arm. Q. Where were you at that time? A. I was standing right at the combing, waiting to go down myself. * * * Q. Was there any other way of going down that ship except in the way he went down? A. No, sir; there was no way at all. * * * Q. Was there any other way of getting down in the hold of that ship? A. I did not see any other way, but to go down on those boards."

These witnesses testified that the foreman was Jack Eaton, and that he was dead. They also testified that they had worked the previous day in hold No. 2, and that no loading up to that time had been done in hold No. 1. The only testimony which in any way conflicted with the testimony of the three stevedores was that of Henry W. Eaton, who testified on November 30, 1914, more than eight years after the accident:

"Q. Were you working out on the river front at that time? A. Yes, sir. Q. What was your business out there? A. I think I was foreman for Mr.

Legeai. I had been foreman, off and on, for Mr. Legeai; but at that time I think I was the regular foreman. Q. For Mr. Legeai? A. Yes, sir. Q. Are you a brother of Jack Eaton? A. Yes, sir. Q. Mr. Legeai was the stevedore who had the contract for unloading this ship, was he not? A. He was loading at the time, but I was not foreman of the Alabama. My brother was foreman at that time of the Alabama. * * * Q. Are you familiar with the Alabama? A. Yes, sir. Q. Do you know whether she has any long ladders to go down in this hold or not? A. Yes, sir. Q. Did she have at that time? A. Yes, sir. Q. Were there means of entrance into the holds besides this ladder? A. No, sir; if they had I did not see it. Every time I went down or up, I went up and down the ladders."

### Cross-examined:

"Q. How often did you work on the Alabama? A. I worked on her pretty often when she was lying here. Q. How often? A. It is so long ago that I could not say, but nearly every other trip she came in. Q. Every other trip she came in? A. Very near that. Q. Can you specify any one time that you worked on her. You do not recollect? A. No, sir, I could not without getting the pay roll or something like that; but I do not think you can get that, it has been so long ago."

Eaton was not the foreman in charge of the loading of the Alabama at the time of the accident. When he was asked, "Do you know whether she had any ladder to go down in this hold or not?" and answered, "Yes, sir," no question had been asked indicating any particular hold. The general answers of acquiescence, given by him eight years after the accident occurred, amount to little more than a statement to the effect that ships usually have ladders which go down into the holds, and that, no doubt, that was the case with reference to the Alabama.

The three stevedores testified definitely with reference to a definite time, and with reference to a definite hold. The circumstances of the serious accident which they saw, and which Eaton did not see, were such as to make a permanent mental impression. Their statements have all the indicia of truth. They are entirely in accord with the statement written by the attorney for the libelant at the time of the accident. Notwithstanding the long delay in bringing the libel, if there was a ladder in hold No. 1 of the Alabama, it ought not to have been difficult to secure testimony to that effect, more convincing than Eaton's answer, "Yes, sir," to the questions of appellees' attorney.

The question as to whether the planks or battens which caused the accident were part of the equipment of the ship, and had been put in place by those in charge of the ship, or by the persons doing the loading, is answered by the testimony of Frank Howard:

"* * * Q. Who put these boards in between the stanchions? A. I don't know; they came there that way. They were put in there by the ship's crew, or some of the men; they came that way. Q. You do not know who put them there? A. No, sir; our men did not put them there. I know that our men did not have anything to do with them at all. We did not have anything to do with them at all. * * * Q. Do you know what those boards were used for in the ship? A. I do not know, any more than I think they were put there to keep the cargo from shifting. Q. They were there when you all went to work? A. Yes, sir. Q. Did your foreman put them there? A. No, sir. Q. Did your stevedore put them there? A. No, sir; I see them in all these freight ships, but these other freight ships have a ladder, but this ship didn't have any, I see those shifting boards in all those freight ships."

Edward Gaither testified as follows:

" * * * Q. Did you work on the Alabama before that time? A. Yes, sir; many times. Q. Did she have any other way to go down that you know of? A. Not in No. 1; never did. * * * "

That the accident occurred as alleged is not seriously questioned; that the libelant was injured as alleged is amply proved; that there was no ladder to go down into the hold is satisfactorily established by the specific testimony of three witnesses, against the generalization of the fourth; that the planks, the turning of which caused the accident, were part of the equipment of the ship, and were put in place by those in charge of the ship, is not put in issue, except by a general denial, and is fully established by the only testimony there is upon the subject. Libelant used all reasonable diligence in the institution of the suit; he has established the fact of his injury, and that the injury was the result of the failure of the ship to perform its duty with reference to providing him a safe place in which to work. The judgment should have been for appellant.

Libelant was a strong, healthy, experienced longshoreman. He states that his arm was broken and that he was "all stove up." This testimony is doubtless confirmed by the statement of the attending physician, who treated him "for a fracture of the humerus of the middle third," and other injuries "which procrastinated the ailment." Libelant was in bed more than 40 days. He resumed work after 90 days, but could not then do the heavy, well-paid labor to which he had been accustomed.

Seven hundred and fifty dollars will not more than compensate him for his suffering and loss of time, and judgment will be entered for him against appellees for that amount, and for all costs.