THE ADOUR.

District Court, D. Maryland.　September 22, 1927.

No. 1389.

1. Shipping ⇐⇒86(1)—Delay of 2½ years held not laches, barring stevedore's libel for injuries.

Stevedore's delay for 2½ years in bringing libel against steamship for injury *held* not laches, barring recovery, in view of facts.

2. Admiralty ⇐⇒34—Question whether action is barred by lapse of time is within discretion of court, which, though not bound by statutory limitations, should not enforce stale demands.

In admiralty, the question whether or not an action should be barred by lapse of time is within the discretion of the court, and, while admiralty courts are not bound by any statutory period of limitation, stale demands should not be enforced, where there has been an unreasonable delay in asserting them.

3. Negligence ⇐⇒15—Where negligence of two or more persons produces single injury, they are joint tort-feasors, notwithstanding absence of common design.

Where the negligence of two or more persons produces a single injury, they are joint tort-feasors, even though there was no common design or concert of action, though there must be a community of action, in the sense that both must participate to some extent in the same wrongdoing.

4. Shipping ⇐⇒84(3¼)—Ship must provide stevedores reasonably safe place to work, notwithstanding their employer is independent contractor.

A ship must provide stevedores a reasonably safe place to work, regardless of the fact that their employer is an independent contractor.

5. Shipping ⇐⇒84(3¼)—Ship is responsible for proper construction and maintenance of bulkhead employed to stabilize linseed cargo.

A ship is responsible for proper construction of bulkhead erected to stabilize linseed cargo, and has duty to maintain bulkhead in reasonably safe condition.

**6. Shipping ⟷85—Ship's officers and stevedores held jointly responsible for negligent maintenance of bulkhead.**

Ship's officers and stevedores *held* jointly responsible for improper maintenance of bulkhead erected to stabilize linseed cargo, fall of part of which caused injury to stevedore.

**7. Release ⟷29(4)—Stevedore's release of stevedore company held effective as release of ship jointly liable for injuries, notwithstanding attempted reservation of rights against it.**

Where stevedore company and ship were jointly liable for stevedore's injury, release given to stevedore company, wherein stevedore reserved whatsoever rights he might have against the steamship or her owners, *held* effective as release also of steamship, in view of amount of damages received and unconditional nature of release.

**8. Release ⟷25—Effect of release from liability for personal injuries is governed by law of state where given.**

Effect of release from liability for personal injuries given in New York is governed by the law of that state.

**9. Release ⟷29(4)—Release reserving rights against joint tort-feasors is construed as covenant not to sue in New York.**

Under the law of New York, a release from liability for personal injuries, wherein rights against joint tort-feasors are reserved, is construed as a covenant not to sue.

**10. Release ⟷29(1)—Release of joint tort-feasor bars recovery against other joint tort-feasors only if unconditional, or if full satisfaction has been accorded.**

If one having claim against joint tort-feasors has not obtained complete satisfaction through transaction resulting in release of one of such tort-feasors, recovery may still be had under the law of New York against other joint tort-feasors, though, if release is unconditional, or if full satisfaction has been accorded, it is a bar to further recovery.

**11. Release ⟷29(4)—Release intended to discharge liability of one joint tort-feasor extinguishes entire liability, notwithstanding attempt to reserve rights.**

Where it is apparent that release was intended to discharge the liability of one of joint tort-feasors, it operates as an extinguishment of the entire liability, notwithstanding clause reserving right against other tort-feasors.

In Admiralty. Libel by Giuseppi Bagnara against the steamship Adour. Libel dismissed.

Harry S. Austin, of New York City, and William W. Powell, of Baltimore, Md., for libelant.

George Forbes and Henry L. Wortche, both of Baltimore, Md., for respondent.

COLEMAN, District Judge. The libelant in this case was severely injured on June 12, 1923, while engaged as a stevedore in unloading linseed from the steamship Adour at the port of New York. The injury was caused by the fall of part of a wooden bulkhead, erected in the ship to stabilize the cargo. Libelant brought an action for damages in the common-law courts of New York on April 3, 1924, against the stevedoring company, C. F. Terrence & Sons, which resulted in a compromise payment to him of $7,500 on July 30, 1925, at which time he signed a release of all claims against Terrence & Sons, but reserved any rights he might have against the steamship Adour. Previous to that time—that is, from June 12, 1923, till March 25, 1924—the libelant was paid, in various installments, $926, by the Workmen's Compensation Commission of New York. The present libel was not filed until December 11, 1925, against the Adour, to recover further damages for the same injury; the steamer being then at the port of Baltimore.

[1, 2] First, as to the matter of laches, which the respondent strenuously urges as a bar to recovery, there was a lapse of 2½ years between the occurrence of the injury and the time when the present suit was instituted. In admiralty, whether or not an action should be barred by lapse of time is within the discretion of the court. Admiralty courts are bound by no statutory period of limitations. The Key City, 14 Wall. 653, 20 L. Ed. 896; Great Lakes Transp. Co. v. Hand & Johnson Tug Line (D. C.) 289 F. 130. Stale claims should not be enforced, where there has been such unreasonable delay in their assertion that to allow them would be unjust.

It will be noted that the state statutory period has not elapsed, either under the New York or Maryland limitation, which is the same, three years, in both jurisdictions. Further, the evidence shows that after June 20, 1923, the date when the Adour left New York, eight days after libelant was injured, the ship was not in a convenient American port till July 20, 1925, when she arrived in Baltimore and remained until August 8. From that time until the date of the libel, December 11, 1925, she was once in Philadelphia (August 31 to September 9, 1925) and twice in New York (July 4 to 10, and October 7 to 15, 1925). Since it does not appear that libelant or his attorney actually had notice of these visits, or that they were actually published in various maritime journals, the evidence seems insufficient to bar libelant. If, in fact, he was seeking to libel the vessel beyond the port of New York, as is suggested by respond-

ent, on the theory that his good faith might be questioned if he libeled her immediately after collecting from the stevedore company, without showing that he knew she was at Baltimore when the release was executed, and further, if he was aware of her other movements, as respondent contends, then it seems that he would have libeled her at Philadelphia between August 31 and September 9. While the vessel also stopped at New Orleans and Key West, it seems clear that libelant was not required to seek the vessel at these distant ports.

There only remains to be considered the period of approximately six months, from July 20, 1925, to December 11, 1925; that is, the time between the date when the vessel was first again available at Baltimore and the date of the filing of the libel. If, as the court believes, there was no unfairness in waiting until the first of the above date, a further delay of six months does not appear inequitable. On the whole, therefore, it appears that the conduct of libelant in delaying as he did does not justify barring the present claim. The Alabama (C. C. A.) 242 F. 431.

Turning to the merits of the case, many almost hopeless conflicts are found in the evidence, due in large measure to the fact that most of the witnesses were rather illiterate, knowing only a foreign tongue, and therefore being required to give their testimony through an interpreter. When the libelant himself took the stand, he was either unable or unwilling to speak coherently. Whether he was feigning to some extent is not clear to the court. But, in any event, the court is satisfied that he was far from normal mentally, either as a result of the injury, which is the basis of his suit, or from some other cause. In all, eight witnesses testified, and the depositions of two others were taken; that is, we have the testimony of five winesses on behalf of libellant and five on behalf of respondent.

Summarizing the facts, as far as it is possible to do so, it appears that the vessel, which was of Norwegian ownership, arrived at the port of New York with a cargo of linseed from South America, and that before the cargo was taken on the owners of the ship had caused a bulkhead to be erected about half-way between the hatches of No. 1 and No. 2 holds, the purpose of which was to prevent the shifting of the cargo fore and aft. The cargo was also accommodated by a shifting board, running fore and aft, the purpose of which was to prevent the cargo from moving from side to side. The bulkhead in question consisted of vertical timbers, approximately 3 inches thick, 12 inches wide, and 19 feet high, against which were placed, on both sides, two heavy cross-boards, some 24 feet long, 2 inches thick, and 7 inches wide, one about 6 feet from the bottom of the hold, and the other about 6 feet from the top. These cross-boards were held in place by so-called "shores," supports, or stretchers, which ran from the floor of the hold to the cross-boards. There were four or five of these shores supporting each cross-board, and they were chocked with wooden blocks at both their upper and lower ends; that is, against the cross-boards and against the floor of the hold. The longer ones—that is, those supporting the upper cross-board were 6 inches square and 16 or 17 feet long. The shorter ones—that is, those supporting the lower cross-board—were about 10 feet in length, and otherwise of the same dimensions. The vertical timbers of the bulkhead were further held in place by the permanent beams of the ship and by a board along the floor of the hold. The evidence is to the effect that this construction was of a standard type, commonly used to steady cargo of this kind.

It appears that, on the day following the vessel's arrival in New York, C. F. Terrence & Sons, stevedores, began discharging the cargo. After the work had progressed five or six days, and was nearly complete, the libelant, while engaged with fellow stevedores in shoveling linseed from No. 2 hold into the buckets that were used in discharging the hold, was struck on the head by a falling board or plank. There is an irreconcilable conflict in the testimony as to just what part of the bulkhead it was that fell. Numerous interrogatories failed to clarify the situation. The most logical deduction from all of the testimony would seem to be that the upper cross-board, originally supported by the long shores, fell, due to some unauthorized and improper removal of one or more of these supports. There is no testimony of an eyewitness to the accident.

[3] There is no claim that the accident was unavoidable, so it now becomes necessary to determine the responsibility for the condition of the bulkhead; that is, to determine whether the ship, or the stevedore company, or both, are responsible. If both are responsible, then, under the circumstances, there can be only one cause of action, because, where the negligence of two or more persons produces a single injury, they are

joint tort-feasors, even though there was no common design or concert of action, although there must, of course, be a community of action, in the sense that they must both participate to some extent in the same wrongdoing. The Ross Coddington (C. C. A.) 6 F.(2d) 191; Kirland v. Ensign-Bickford (D. C.) 267 F. 472. If it be a fact that the ship and the stevedore company were joint tort-feasors, we still have the further question as to the effect, with respect to the ship, of the release given by libelant to the stevedore company.

[4] As to the first question, namely, the responsibility for the improper condition of the bulkhead, which caused the accident, we start with the premise that the ship must provide for stevedores a reasonably safe place in which to work, regardless of the fact that their employer is an independent contractor. Grays Harbor Stevedore Co. v. Fountain (C. C. A.) 5 F.(2d) 385; Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157; Imbrovek v. Hamburg-American Steam Packet Co. (D. C.) 190 F. 229; Id. (C. C. A.) 193 F. 1019.

[5] The ship was responsible for the proper construction of the bulkhead in the first instance, and the court is of the opinion that a similar duty existed to maintain the bulkhead in a reasonably safe condition, because the bulkhead had become part of the ship.

[6] The next question, therefore, is: Did the ship meet this obligation? On this point there is much conflict in the evidence. The second mate testified that he saw the stevedores remove the shores, and he further indicated that he understood the ship's officers had authority to stop the work and repair dangerous conditions, if necessary, but nothing was done. The testimony of the chief officer is to the same effect. It was conceded that none of the ship's officers made an inspection. It appears from the ship's testimony, however, that her officers were asked by the stevedores for permission to remove the supports, which was refused. The foreman and assistant foreman of stevedores testified that they complained about the danger to the chief officer, although he denied ever receiving such complaint. Libelant complained to his foreman that the bulkhead was dangerous, and the entire gang threatened to quit work if the condition was not remedied. Libelant's witnesses denied asking for permission to remove, or that they did remove, any of the

supports, although their testimony was vague, and conflicting as to the number that were in place just before the accident.

On the evidence as a whole, the court is forced to the conclusion that the conduct of both the ship's officers and the stevedores contributed in some degree to the accident; that is, that whereas the stevedores were probably negligent, either in removing some of the shores or in continuing to work after they were removed through no fault of their own, or both, the officers of the ship were also guilty, through their omission to heed the complaints given them by the stevedores or to initiate an inspection on their own part, or both. See Keliher v. The Nebo (D. C.) 40 F. 31. This situation, therefore, undoubtedly created a joint tort-feasor relationship. Because of the view which the court takes of the release, as hereinafter explained, it becomes unnecessary to consider what application the Merchant Marine Act of 1920 (41 Stat. 988) may have to the case, or the defense of contributory or comparative negligence, or the fellow servant or assumption of risk doctrines.

[7, 8] Being now brought to the next question, namely, that of the effect of the release given by the libelant to the stevedore company, we find that the release was executed in New York. Therefore the law of New York must govern. Holdridge v. Farmers', etc., Bank, 16 Mich. 66; Greenwald v. Kaster, 86 Pa. 45. The release recites that the libelant does "remise, release, and forever discharge" the stevedore company "of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, premises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law or in equity," which libelant had or might ever have against the stevedore company. Then followed the following provision:

"It is further understood and agreed by and between the parties hereto that the releasor reserves whatsoever rights he may have for damages for personal injuries incurred on the 12th day of June, 1923, upon the steamship Adour, against the owners of said steamship Adour, or any and all others having an interest therein, other than the releasees in this instant."

[9, 10] Under the law of New York, an instrument such as the present one is construed as a covenant not to sue. Irvine v.

Millbank, 56 N. Y. 635; Walsh v. Hanan, 93 App. Div. 580, 87 N. Y. S. 930; Gilbert v. Finch, 173 N. Y. 455, 66 N. E. 133, 61 L. R. A. 807, 93 Am. St. Rep. 623. On this theory, if there has, in fact, been no complete satisfaction through the transaction covered by the release, further recovery has been allowed under the New York decisions. Irvine v. Millbank, supra; Hirshfield v. Alsberg, 47 Misc. Rep. 141, 93 N. Y. S. 617; Gilbert v. Finch, supra; Hood v. Hayward, 124 N. Y. 1; 26 N. E. 331. See, also, Barnett v. Conklin (C. C. A.) 268 F. 177; Carey v. Bilby (C. C. A.) 129 F. 203. But where the release is unconditional, or if full satisfaction has been accorded in the first instance, it is held to be a bar. Mitchell v. Allen, 25 Hun (N. Y.) 543; Delong v. Curtis, 35 Hun (N. Y.) 94; Brogan v. Hanan, 55 App. Div. 92, 66 N. Y. S. 1066. See, also, Tanana Transp. Co. v. North American Co. (C. C. A.) 220 F. 783; The West Keats, 1925 A. M. C. 413;[1] The St. Cuthbert (D. C.) 157 F. 799; Williston on Contracts, § 338a. Upon first reading, there is an apparent conflict in the New York decisions, but upon careful analysis they are believed capable of being reconciled as above.

While, in the present case, testimony as to the exact nature and extent of libelant's injuries was reserved for later submission, depending upon whether liability on the part of the ship were established, nevertheless there is sufficient evidence in the record to indicate that $7,500 was a full award for the injury sustained, and that it was accepted as such, especially when it is considered that libelant received nearly $1,000 additional from the state Workmen's Compensation Commission of New York. Personal injuries are never exactly alike, so the awards made in other cases are not controlling. Of course, were there any coercion or fraud surrounding the payment to, and the release from, the libelant, the situation would be quite different. Although at the time of the trial libelant may have been incompetent to give a valid release, there is no evidence that at the time he signed the release he did not fully understand what he was doing, or that he was improperly dealt with.

[11] Where it is apparent from the paper that the intention is to discharge the liability of one of the joint wrongdoers, the correct rule, because otherwise courts would promote double payment for the same

wrong, is that the entire liability is thereby extinguished, and that any clause by which parties seek to reserve a right of action against the other wrongdoer is repugnant to the release and void. It appears that the settlement was made and the release taken on behalf of the stevedore company by its insurer, the Travelers' Insurance Company, and that that company has brought an action in the United States District Court for the Southern District of New York, in admiralty, against the ship, for contribution to the settlement. This fact would appear to be further evidence of the conclusive nature of the release.

A decree will be signed, dismissing the libel.