## THE JOSEPH VACCARO.

### (District Court, E. D. Louisiana. June 25, 1910.)

#### No. 14,015.

1. COLLISION (§ 125*)—EVIDENCE—CAUSE OF COLLISION—OVERTAKING VESSEL.
   Evidence on libel against an overtaking steamship for colliding with a steam tug *held* to show that the direct cause of the accident was an unforeseen shifting of the river current..
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 275, 277; Dec. Dig. § 125.*
   Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

2. COLLISION (§ 51*)—OVERTAKING VESSELS—DUTIES.
   An overtaking vessel must keep out of the overtaken vessel's way.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 57; Dec. Dig. § 51.*]

3. COLLISION (§ 102*)—NARROW CHANNEL—VESSELS ABREAST—JOINT NEGLIGENCE.
   A steam tug and a steamship to which the tug had taken a pilot were equally negligent in attempting to enter a pass less than 700 feet wide, abreast and without exchanging signals, at a point where the current was treacherous and frequently shifted.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 182, 190, 196; Dec. Dig. § 102.*]

4. SHIPPING (§ 81*)—NEGLIGENCE OF PILOT—LIABILITY.
   In admiralty a vessel may be held in rem for the negligence of a compulsory pilot, though the owner would not be liable in an action at common law.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 347; Dec. Dig. § 81.*]

5. PILOTS (§ 2½*)—PILOTS' ASSOCIATION—NATURE—"PARTNERSHIP."
   The Associated Branch Pilots of the Port of New Orleans, an association created to pilot and assist in the salvage of vessels, the members sharing in the expenses and the profits equally, the association collecting the fees and being governed by a president and board of directors, is an ordinary partnership under the law of Louisiana and may select, control, and discharge any of its members.
   [Ed. Note.—For other cases, see Pilots, Cent. Dig. § 17; Dec. Dig. § 2½.*
   For other definitions, see Words and Phrases, vol. 6, pp. 5191–5202; vol. 8, pp. 7746–7747.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6.** PILOTS (§ 2½\*) — PILOTS' ASSOCIATION — RIGHT TO SUE — NEGLIGENCE OF MEMBER.

The Associated Branch Pilots of the Port of New Orleans, being a partnership, cannot maintain libel against a steamship for collision with the association's tug, based on negligence of the steamship's pilot, where he is a member of the association.

[Ed. Note.—For other cases, see Pilots, Cent. Dig. § 17; Dec. Dig. § 2½.\*]

Libel by Bernard Michel against the steamship Joseph Vaccaro. Libel dismissed.

J. R. Beckwith and Rice & Montgomery, for libelant.
Howe, Fenner, Spencer & Cocke, for defendant.

FOSTER, District Judge. This is a case of collision. The libelant, as president of the Associated Branch Pilots of the Port of New Orleans, La., brings his libel in rem against the steamship Joseph Vaccaro on behalf of the said association for damages occasioned the steam tug Underwriter, belonging to the said association, arising from a collision of the Vaccaro with said tug.

There is, as usual, some conflict of testimony as to just how the accident happened. Resolving this as best I can in order to have all the witnesses speak the truth if possible, I find the facts to be as follows:

On the night of the collision, February 23, 1907, about 11:30 p. m., the Vaccaro appeared off the mouth of the South Pass of the Mississippi river, and the Underwriter went out to her for the purpose of putting a pilot on board. The Vaccaro was lying about half a mile outside of the end of the jetties, and the Underwriter approached on her port side, went around her stern, came up on her starboard side, stopped a little forward of her beam, and a pilot put off in a small boat to board the Vaccaro. The Underwriter then dropped astern of the Vaccaro, and after picking up the returning small boat went about on the Vaccaro's quarter and came up on her port side. Both vessels got under way at about the same time, the Underwriter being a little astern of the Vaccaro when the latter started; but the Underwriter went ahead faster and was in advance with the Vaccaro overlapping her stern, and about 100 feet in width separating the two vessels, when they attempted to enter the South Pass jetties.

When fully in the current of the river, the Vaccaro took a sudden sheer to the left and ran into the Underwriter, striking her about 20 feet from her stern and cutting her plates down below the water's edge; the collision occurring about eight minutes after the Vaccaro started. The vessels exchanged no signals whatever. When the Vaccaro sheered, the accident seems to have been inevitable, and thereafter neither vessel was guilty of any fault.

It is true the master of the Underwriter testified that he went ahead full speed before the Vaccaro got under way, and opened up a gap between the vessels; but it is not probable that he was paying any attention at all to their relative positions. He was not looking, and did not know where the Vaccaro was, until after he had given a signal

to slow down the Underwriter, and only then did he see the dangerous proximity of the Vaccaro. Besides he is contradicted by others of libelant's witnesses. The engineer of the Underwriter testifies that they were running at about six knots an hour, half speed, when he received the signal to slow down. He did not obey it, as it was immediately followed by a signal for full speed ahead, and then he had to open the valves to let the steam into the low pressure cylinders to comply with the order. The pilot of the Vaccaro, libelant's witness, testifies that the Underwriter went about under the stern of the Vaccaro and then passed her on the port side while they were under way. This is corroborated by the master of the Vaccaro. The engineer of the Vaccaro also testified that her engines were stopped when he got the signal to go ahead full speed, and that it would take about a quarter of an hour to develop the Vaccaro's maximum speed of 12 knots.

The first inquiry is, naturally, as to the proximate cause of the accident. It is contended by libelants that the steering gear of the Vaccaro did not work; but I do not find this borne out by the evidence. There is some testimony to show that at previous times the steering gear of the Vaccaro had worked stiffly; but the same may also be said of the Underwriter. Both vessels have steam steering gear. Several witnesses testify without contradiction that the Vaccaro's steering gear was in perfect order, and the testimony of her pilot, who was in the best position to observe the handling of the boats, shows that his orders were responded to and she answered her helm up to the moment she took the sheer. I have no doubt the steering gears of both vessels were in good order at the time of the collision. Both vessels were properly manned and lighted.

The South Pass jetties are very narrow, about 700 feet in extreme width, and frequent wing dams tend to further constrict the channel. On this particular night there was a high stage of river, and the current going out of the mouth of the jetties was very strong, probably running at least five miles an hour. The evidence also shows that at this particular point the current is very treacherous, frequently shifting, and sometimes indulging in unaccountable whirls and eddies. The Vaccaro was on her proper course, running steady and obeying her helm, but suddenly sheered when the current struck her, so I must conclude that the direct cause of the accident was one of those unforeseen shiftings of the current, and to that extent the collision was unavoidable.

Nevertheless, had the vessels not been in such dangerous and close proximity, no serious accident would have occurred, at least not to the Underwriter. The Underwriter and the Vaccaro were in charge of skillful and experienced pilots who daily perform their relative duties in sight of each other. Necessarily the pilot of the Vaccaro was in absolute control as to the speed and course of the vessel, and he ought to have known the probable maneuvers of the Underwriter. The same may be said of the master of the Underwriter. He ought to have known approximately what the course and speed of the Vaccaro would be. Both men ought to have known the dangers of the current in this narrow pass. Both of these men were fully aware of the danger but

apparently, perhaps because of constant association and familiarity with it, each seems to have been oblivious to the possible result of these two vessels entering the pass practically abreast.

It is urged that the Vaccaro was an overtaking vessel, and the burden is on her, therefore, to establish want of negligence in herself to defeat a recovery by the Underwriter; but the present case is unique and cannot be governed by hard and fast rules as to overtaking or crossing. It may be that at the time of the collision the Vaccaro was the overtaking vessel, as her speed was being gradually accelerated; but it is also true that the Underwriter was first the overtaking vessel, and, therefore, when she passed the Vaccaro it was incumbent on her to keep out of the latter's way. So, too, the pilot in charge of the Vaccaro ought to have known better than to enter the pass practically abreast of another ship. To this extent he was equally at fault with the master of the Underwriter. In common prudence one of these boats should have stopped and allowed the other to go ahead. Perhaps the duty was greater on the Underwriter, as her sole object in going out was to insure the safe entrance of the Vaccaro. Yet these two experienced pilots, starting like entrants in a race, exchanging no signals, made the extremely hazardous navigation of the pass more difficult by attempting to negotiate it together. I consider they were equally negligent.

But the question of negligence is not the only one to be determined in this case.

It is contended by the claimant that libelant is a partnership and cannot recover because the Vaccaro's pilot is a member and she was compelled by law to take him. Libelant denies the partnership and relies mainly on the case of Guy v. Donald, 203 U. S. 399, 27 Sup. Ct. 63, 51 L. Ed. 245, to recover in any event.

In The Merrimac, 14 Wall. 199, 20 L. Ed. 873, the Supreme Court held that the Louisiana law did not enforce compulsory pilotage, but since then the statute of 1877 (Act No. 63 of 1877, p. 103) has made a material change. It is certain the Vaccaro was in charge of a compulsory pilot, a member of the association libelant herein, not the choice nor the voluntary agent of her master or owner, and her fault for the collision was solely his. However, it is settled in American jurisprudence in admiralty a vessel may be held in rem for the negligence of a compulsory pilot, though the owner would not be in an action at common law. The China, 7 Wall. 53, 19 L. Ed. 67; Homer Ramsdell Trans. Co. v. La Compagnie Générale Transatlantique, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155.

It may be that a voluntary association of pilots and its members are not liable at the suit of the owner of a vessel which has been held for damages by reason of the fault of one of its members; but what is the situation here.

In the case of Guy v. Donald, 203 U. S. 399, 27 Sup. Ct. 63, 51 L. Ed. 245, the Supreme Court held that the members of the Virginia Pilots' Association were not partners, and that they were not liable to owners of piloted vessels for the negligence of each other. The court based its decision mainly on the grounds that substantially the whole

government of the association was in the hands of a board of commissioners instituted by the law of Virginia, and it existed solely by permission of said board, on the implied condition that all the pilots belong to it, and therefore the association, could not select, control, or discharge one of its members.

The Louisiana in many respects is identical with the Virginia association; but there are some radical differences. It is not a commercial partnership under the law of Louisiana, but does it not possess every element to make it an ordinary partnership? Its organization is authorized by law, and no restrictions are placed upon the form it may take; it could be either a corporation or a partnership. By a written agreement it adopts a common name and declares its objects and purposes to be to carry on the business of piloting vessels and to assist in the salvage of vessels. It owns tangible property of great value, and the share of each member in the association property is fixed by the articles of agreement. No person can become a member without the consent of the majority of the members, and once in he cannot withdraw except by the same consent; but he ceases to be a member on surrendering his branch. A new member must pay to the association an amount sufficient to make him an equal owner in the association assets. He must bind himself to devote his entire time to the association and to not engage in any business at variance with its interests, nor in competition with it. It is provided that the members shall share the expenses and the profits equally, and a reserve fund of $10,000 is provided for. No member has any interest in the fees he earns, as his services are for the exclusive benefit and profit of the association. The association issues the bills for pilotage, and, when necessary, sues to recover them, in its own name, without regard to the individual member. The management of the association is by a president and board of directors. They are given full power to prescribe and enforce all regulations that may be necessary, or expedient for the management of the business, the assignment of pilots to duty on outgoing or incoming vessels or the pilot boats of the association, and for the discipline of the association.

It seems that all the branch pilots licensed to pilot vessels into the mouth of the Mississippi river belong to this association, and perhaps it would be impossible for any one to obtain, or retain, a branch who did not belong. Branches are issued by the Governor of the state on recommendation of a board of examiners composed of three branch pilots, and this same board has the power to report any pilot to the Governor for cancellation of his license, practically at its discretion. As a matter of fact this board is composed of the president and two members of the association; but in contemplation of law there might be a dozen associations, or each pilot might do business on his own account provided he had the necessary equipment.

The Supreme Court, in passing upon the character of libelant's predecessor, practically the same association, held it to be a partnership, and thus tersely stated the proposition:

"Whilst every association of persons does not imply a partnership, it is certain that every partnership implies an association. In this instance,

·as in many others, we find nothing in the name." Levine v. Michel, 35 La. Ann. 1126.

In view of the foregoing, I am constrained to hold that libelant is an ordinary partnership under the law of Louisiana, and also that it had the right to select, control, and discharge any of its members, and therefore the decision in Guy v. Donald, 203 U. S. 399, 27 Sup. Ct. 63, 51 L. Ed. 245, is not controlling.

So here we have a novel case. A partnership is suing to recover for damages to the partnership property occasioned by the fault of one of its members. When his wrongful act was committed, he was the specially selected agent of the association acting strictly within the scope of its business. He certainly could not recover in an individual suit, yet he will recover if the association is successful.

I cannot imagine upon what theory of law or justice the association can stand in any better position than does the individual member, and I do not think the admiralty doctrine, as laid down in The China, 7 Wall. 53, 19 L. Ed. 67, should be stretched to cover this case.

The libel will be dismissed.