Liv GENERAL, surviving spouse and Administratrix of the Estate of George General, Deceased, Plaintiff,

v.

PILOTS' ASSOCIATION FOR the BAY AND RIVER DELAWARE, and Henri V. Rice and all other members of the Pilots' Association for the Bay and River Delaware, Defendants.

Agnes M. HEALEY, surviving spouse and Executrix of the Estate of Joseph A. Healy, Jr., Deceased, Plaintiff,

v.

PILOTS' ASSOCIATION FOR the BAY AND RIVER DELAWARE, and Henri V. Rice and all other members of the Pilots' Association for the Bay and River Delaware, Defendants.

Civ. A. Nos. 1896, 1897.
United States District Court
D. Delaware.
May 26, 1966.

Henry A. Wise, Jr., Wise & Suddard, Wilmington, Del., for plaintiff.

Robert W. Wakefield, Walker, Miller & Wakefield, Wilmington, Del. and Benjamin F. Stahl, Jr., Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for defendants.

LAYTON, District Judge.

On March 7, 1957, the USNS MISSION SAN FRANCISCO, a tanker owned by the United States of America, but civilian manned and operated by Mathiasen's Tanker Industries, Inc., was proceeding up the Delaware River. The SS ELNA II, a dry cargo vessel, registered under the flag of the Republic of Liberia, owned and operated by Oskar Tiedemann and Company, was proceeding down-river. The two vessels came into collision at the intersection of the Bulkhead Bar and the Deepwater Point Ranges. Henri V. Rice, one of the defendants in this action and a member of the Pilots' Association for the Bay and River Delaware (hereinafter referred to as "Pilots' Association"), was the river pilot conning the SS ELNA II at the time of the collision.

Subsequently, the owners of both vessels filed petitions for exoneration from or limitation of liability. Included among the parties filing claims in the limitation proceeding are the plaintiffs herein, the personal representatives of the estates of George General and Joseph A. Healy, Jr., members of the crew of the MISSION SAN FRANCISCO who lost their lives in the casualty.

The plaintiffs commenced these civil actions against the Pilots' Association, Pilot Rice and the other members of the Pilots' Association for the wrongful death, loss of earnings, and pain and suffering of their respective spouses.[1] The liability of Pilot Rice was established by the trial of the limitation proceedings and is, accordingly, not contested herein (Petition of Oskar Tiedemann and Company, and of the United States of America) 179 F.Supp. 227 (D.C.Del.1959); aff'd 289 F.2d 237 (C.A.3, 1961). There has been no such determination with respect to the Pilots' Association and the then members other than Pilot Rice. The Pilots' As-

---

1. Plaintiffs having recovered fully in the limitation proceedings, their right to recover again as the result of the same accident is questionable. However, that point is not now before me.

sociation and its members (other than Pilot Rice) have filed a motion for judgment on the ground that, on facts not in dispute, there is no legal basis for a finding of liability against them.

Plaintiffs do not allege any separate fault or negligence on the part of the Pilots' Association, but take the position that it is vicariously liable for the negligence of one of its member pilots in his duties as a river pilot, while aboard the SS ELNA II.

It is appropriate to say at the outset that, historically, it was customary for individual pilots, or groups of pilots, to maintain their own launches, to board incoming vessels and to vie with each other in "speaking" an approaching ship so as to be entitled to render pilotage services. Obviously, this led to inefficiency, at least as far as the pilots were concerned, with much wasted expense and effort on the part of those pilots who were too late in their tender of services. Moreover, heavily increasing river traffic required the services of an agent or some form of organization to administer the complex details of providing and maintaining pilot boats, rendering and collecting pilot fees and furnishing an unfailing supply of pilots in accordance with a rotating schedule. Thus, over the course of time this defendant and many similar associations were formed throughout the land to overcome these difficulties. Generally speaking, the members agreed to serve in rotation in order to insure the availability of pilots, regardless of unfavorable weather conditions and the discouraging prospect of a slow moving vessel which would increase the time, but not the fee. Again, in the interest of equality, there was agreement by the Delaware pilots that they would share equally (within classes of licenses) the net proceeds, even though there is inevitable variance in their gross contributions to the fund. Since active pilots may not take a vacation (temporary retirement) for less than a month, the monthly distributions to active pilots represent "equal pay for a like number of days worked."

The following undisputed facts appear from affidavits filed by the respective parties.

The Pilots' Association is a voluntary, unincorporated association composed only of Delaware River pilots licensed and acting under the laws of Delaware or Pennsylvania. It is a non-profit organization. The Association is governed by a constitution. The constitution provides, inter alia, (1) for the election of and management by officers and a board of directors (Arts. 1, 7 and 9); (2) membership requirements (Art. 2); (3) equal ownership of association property (Art. 3); (4) an agreement to turn over to the Association any pilotage fees received, with payment therefrom of certain common expenses, with the balance thereafter distributed in accordance with by-law provisions (Art. 4); (5) for grievance procedures to terminate disputes (Art. 5); and (6) powers of the Board of Directors (Art. 10).

The Pilots' Association has also adopted by-laws in amplification of the constitution. The by-laws provide, inter alia, (1) that all the pilots will render services in rotation (No. 17); (2) that bills or statements for pilotage fees will be made out in the name of the pilot, with the Association named as agent (No. 15); (3) that the net earnings of the members of the Association will be divided among all members in accordance with agreed ratios (Nos. 40, 41); and (4) that members of the Association cannot contract for or on behalf of the Association (No. 32).

It should be noted, conversely, that there is no provision in either constitution or by-laws for expelling a member, taking an action with respect to suspension or revocation of a member's license or controlling in any fashion the rendition of pilotage services. The only qualifications for membership in the Association are the possession of a state license and purchase of a certificate of membership.

The existing legislation of Delaware concerning pilots and pilotage is found in Title 23, Del.C., Secs. 101–137. Substantially parallel legislation is found in

the Pennsylvania statutes, 55 P.S. Secs. 1–194. Both states provide for the creation of a Commission or Board invested with power to grant deserving applicants a license, subject to a restriction in the number licensed at any time, to perform the duties and services of a pilot on the Delaware River (Del. Secs. 101, 102, 111, 113; Pa. 1, 31, 41, 42). Applicants examined by the Board and found deserving must first serve a minimum of four years apprenticeship, followed by one year as a third-class pilot, and one year as a second-class pilot before receiving the license of a first-class pilot (Del. Sec. 113; Pa. 44).

The laws provide, inter alia, (1) for suspension or forfeiture of pilot licenses in the event of neglect of duties or misconduct (Del. Secs. 116, 118; Pa. 71, 73); (2) for pilotage rates (Del. Secs. 131; Pa. 131); (3) for compulsory pilotage (Del. Sec. 121; Pa. 171–173); and (4) for Board determination of disputes (Del. Secs. 102, 118; Pa. 72, 194).

It should be noted that both Delaware and Pennsylvania grant licenses to perform the duties of a pilot on the Delaware River only to individual persons who meet the rigid standards set by the respective Boards; that, after a person receives a pilot's license, he is bound to perform faithfully his duties in accordance with the law. It is also noteworthy that legislation requires each pilot to post his individual bond to assure proper performance of his personal duties (Del.Sec. 113; Pa. 44).

The recited facts justify the conclusion that the Pilots' Association is the personal agent for each pilot member. It acts as a clearing house for the transmittal of requests for pilotage; it assists each member in the collection of the statutory pilotage fees by rendering bills in the name of the pilot for whose service a fee is owing; it enables members to share the cost of common expenses, including station boat, launches, transportation, office and sleeping accommodations, and it distributes designated benefits in the event of incapacity, retirement or death.

In all of the above ways, the Association as an entity is extremely active; the Association, however, is powerless to control members in the performance of their profession as pilots. In this area, as the law dictates, the individual pilot is answerable only to himself. For dereliction of duty, it is the licensing State, by its Board of Commissioners, and not the Pilots' Association, which has disciplinary power to act with respect to a pilot's license. In an unbroken line of authorities, extending well over half a century,[2] these features have been considered sufficient to warrant a finding that a pilots' association and its other members are not responsible for any faults by a member rendering pilotage service.

As long ago as 1900, the United States District Court for the Eastern District of Pennsylvania in City of Reading and City of Dundee, 103 F. 696, stated in a case involving this same association:

" * * * Upon this point I agree with the counsel for the association that the relation of principal and agent did not exist. The pilot is a member of the association, but *the association itself has nothing to do with the pilotage of vessels* upon the Delaware river. It is an unincorporated society, intended to further the interests of the pilots, and in part to serve as a beneficial association; but it does not attempt to take charge of vessels, nor to conduct them safely between the capes and the city of Philadelphia. In the appropriate language of the brief:

'It is an association inter sese, and its objects are limited to the management of its pilot boats, and the division of the moneys received from its members according to their respective shares as set forth in its rules. It has no power to contract for pilotage service. The pilot offers himself and serves in his individual capacity, and

2. A much criticized decision is The Joseph Vaccaro, 180 F. 272 (E.D.La., 1910).

Compare The Griffdu, 25 F.2d 312 (S.D. Texas, 1928).

is paid in that capacity. He has no power to bind any or all of his associates; his contracts, his acts of omission or commission, not relating to the purposes of the association. *He is not engaged in the business of the association,* but is a licensee of the states of Delaware and Pennsylvania, respectively, and governed by the laws of said states, respectively, as to his conduct and acts as a pilot.'" (Emphasis supplied.)

And the lower Court's dismissal of this libel was affirmed by the Third Circuit Court, 108 F. 679 (1901), which cited with approval the above quotation and added (P. 685):

> "* * * No contracts of pilotage are made with this association, and no pilot, in conducting a vessel through the bay and river Delaware, is in any wise acting as agent of such association."

In 1906, the Supreme Court of the United States held in Guy v. Donald, 203 U.S. 399, 27 S.Ct. 63, 51 L.Ed. 245, that the members of the Virginia Pilot Association were not legally responsible for the negligence of Guy, one of their members, while serving as the pilot of a steamer. Because this is generally regarded as the leading case, and because its facts are substantially the same as here, it justifies extended analysis.

The case reached the Supreme Court on a certification from the Court of Appeals for the Fourth Circuit of the following questions:

(1) whether the members of the pilots' association were partners,

(2) whether, if partners, they were liable to the owners of piloted vessels for the negligence of each other, and

(3) whether, if not technically partners, they were nevertheless so liable.

The Supreme Court passed over the first question as a matter of terminology, and then answered the second and third questions in the negative. After thoroughly discussing the organization of the pilots' association and the statutes under which pilots were licensed and their activities regulated, it concluded that the individual pilots were not agents of their association so as to make it responsible for the consequences of their negligent acts. In so doing, the court succinctly distinguished the positions of employer and independent contractor, saying (p. 406, 27 S.Ct. p. 64):

> "* * * When a man is carrying on business in his private interest and intrusts a part of the work to another, the world has agreed to make him answer for that other as if he had done the work himself. But there is always a limitation. It is true that he is not excused by care in selection or orders sufficient to secure right conduct, if obeyed. *But when he could not select, could not control, and could not discharge, the guilty man,* he does not answer for his torts." (Emphasis supplied.)

At the conclusion of his opinion, which cites only The City of Dundee, supra, Justice Holmes said (pp. 407, 408, 27 S.Ct. p. 65):

> "All that there is upon which to base joint liability is that the pilots, instead of taking their fees as they earn them, accomplish substantially the same result by mingling them in the first place, and then, after paying expenses, distributing them to those on the active list according to the number of days they respectively have been there. Apart from the possible slight difference between the proportion of days on the active list and days of active service, the case is the same as if each pilot kept his fees, merely contributing to keep up a common office from which his bills might be sent out and where a few details of common interest could be attended to. In the latter case this suit hardly would have been brought. The distinction between it and the one at bar is not great enough to justify a different result."

Again, in 1917, the Second Circuit Court in The Manchioneal, 243 F. 801 (C.A.2, 1917), held with respect to the

liability of a Pilots' Association for the negligence of one of its individual members:

"As to the New Jersey Benevolent Association, if Beebe is not held, his association cannot be; yet we perceive no substantial difference between the facts here shown and those in Guy v. Donald, 203 U.S. 399, 27 Sup.Ct. 63, 51 L.Ed. 245. That case was decided on the ground that all that the members of the Pilot Association there complained against did was, 'instead of taking their (pilot) fees as they earned them, the fees were mingled in the first place, and then, after paying expenses, distributed to those on the active list according to the number of days' they had worked. The New Jersey Association does nothing more, and on the authority of the case cited the decree below was right.

"On the reason of the matter *the test of responsibility is: Who was employed to do the work that was negligently done?* No shipowner believes that he employs the Benevolent Association; he takes a pilot because the law imposes one, and it imposes a man, not an association. The legal fee is the private property of the officiating pilot, and, if he chooses to pool his earnings with his guild-fellows, he has not changed his legal relation to his employer, nor increased the number of such employer's employés." (Emphasis supplied.)

In The Griffdu, 25 F.2d 312 (S.D.Texas, 1928), Judge Hutcheson, after criticizing the decision of the Louisiana Court in The Joseph Vaccaro, 180 F. 272 (E.D. La., 1910), stated (25 F.2d p. 313):

" * * * I think it perfectly clear that Megee [the negligent pilot] was not in any sense a representative of or an agent for the association, in doing the *things which caused the collision.*"

Referring to Guy v. Donald, he said (p. 313):

"There, as here, each pilot was a public officer, appointed individually, re-sponsible individually. The only collective thing about the action was the owning of the boat, and the management of their collections through a secretary, together with the making of rules for the handling of business for the protection of them all."

And in 1929, the Fifth Circuit Court of Appeals in Dampskibsselskabet Atalanta A/S v. United States,[3] 31 F.2d 961 (C.A.5, 1929) said this:

"On the facts above stated the case comes clearly within the rule announced in Guy v. Donald, 203 U.S. 399, 27 S.Ct. 63, 51 L.Ed. 245. There is nothing in the law of Louisiana to take the defendant organization out of the general rule. The case of The Joseph Vaccaro (D.C.) 180 F. 272, relied upon by appellee, does not support such a contention, as the question of responsibility of the association to third persons for the negligent act of one of its members was not considered in that case. The law of Louisiana makes a distinction between trading or commercial partnerships and partnerships for the rendering of personal services, called ordinary partnerships, but, for the purposes of this case, it is immaterial whether a pilots' association be considered a partnership or not. *The fundamental principle underlying the exemption of pilots' associations from liability for negligence of their members in performing their duties as pilots is that the association exercises no control over the manner in which those duties are to be performed,* and therefore a pilot cannot be said to be an agent of the association in that respect. The charge was error." (Emphasis supplied.)

As late as 1959 and 1963, the Federal Courts in United Fruit Co. v. Mobile Towing & Wrecking Co., 177 F.Supp. 297 (S.D.Ala., 1959) and Kuhn v. SS Seatrain Georgia, 1963 A.M.C. 1226 (S.D.N.Y., 1963), held flatly that pilots while piloting ships for a fee do not act as agents for their pilot associations which, conse-

---

3. Judge Foster who delivered the opinion is the same judge who decided *The Joseph Vaccaro*.

quently, are not liable for the negligence of their individual pilot members.

In all the cases just considered, the facts are substantially the same as here.[4] The defendants were voluntary, unincorporated associations. There was the common ownership of a pilot boat or boats and other property. The individual pilot members took turns piloting. Their fees were paid to the association on bills made out by it. The revenue went into a common fund from which the association paid out all business expenses and then divided the remaining net profits among the pilots, the association receiving no profits or fees for the services rendered.

To be distinguished from the type of cases just cited are situations such as found in The Thielbek, 241 F. 209 (C.A. 9, 1917), where the Port of Portland, a municipal corporation, was authorized to provide pilot services to the open sea and the pilots were actually employees of the Port of Portland and subject to the latter's control; and also such cases as Tompkins v. Pilots Association for the Bay and River Delaware, 32 F.Supp. 439 (E.D.Pa., 1940), where the estate of a seaman in the employ of this association recovered a judgment against it as the result of a fall through an open hatch causing death.

■ Plaintiffs' attempt to distinguish the instant case from Guy v. Donald and the other authorities cited is unpersuasive. Their argument that the defendant association is in reality a loose form of partnership is, of course, not only squarely contradicted by Guy v. Donald but also by McGrath v. Nolan, 83 F.2d 746 (C.A. 9, 1936), where the Ninth Circuit Court of Appeals said:

"* * * For the alleged negligent navigation on the part of Nolan after he took over the ship, the pilots' association could be held answerable only upon the principle of respondeat superior as applied to partnerships. Partners are liable for torts inflicted upon third persons by other members of the partnership provided such torts occur in the course of partnership business. McIntyre v. Kavanaugh, 242 U.S. 138, 139, 37 S.Ct. 38, 61 L.Ed. 205; James-Dickinson [Farm Mortgage] Co. v. Harry, 273 U.S. 119, 123, 47 S.Ct. 308, 71 L.Ed. 569. But the libel in this case does not set forth that Nolan was acting within the scope of partnership business at the time in question. It alleges that the pilots were members of a partnership which was 'doing business,' and that the pilots maintained the association 'for their mutual financial gain and benefit and did equally share the profits and losses of the partnership.' Plainly, these allegations do not set forth the nature of the business done by the partnership and contain no inference that the business done by the partnership as partnership was the piloting of vessels. The inference, if there is any, is rather that an individual member, while piloting a vessel, was under contractual relation with the vessel for his own account alone; and that the business done by the pilots in partnership consisted of matters of common interest or gain any number of which may engage the time and attention of professional or trade associations apart from the individual contracts of their membership. See Guy v. Donald, 203 U.S. 399, 406, 27 S.Ct. 63, 51 L.Ed. 245."

■ The contention that the defendant may be liable as a joint adventurer is also not appealing. These facts do not present a joint venture. The defendant makes no profit and stands to share no loss, and again the element of control is lacking. Association of Independent Taxi Operators v. Kern, 178 Md. 252, 13 A.2d 374 (1940), furnishes no support for such a proposition. There the right of control by the Association over its drivers was clear. As the Court said:

"The defendant * * * issued a booklet for the use of drivers and owners containing * * * 92 rules and regulations for the conduct of the business and operations of *cabs, owners and*

---

4. Compare particularly the facts of The Manchioneal, 243 F. at p. 802.

*drivers, and of the personal conduct and behavior of drivers of cars."* (Emphasis supplied.)

Plaintiffs also cite a number of defendant's by-laws as demonstrating the right of control by the Association over the pilots. Typical of these are. by-laws compelling pilots to take their turn as it comes up unless a substitute is arranged for and compelling semi-retired pilots to take regular turns where there is a scarcity of pilots due to illness or otherwise. See By-laws 21, 28, 29, 30 and 19. However, these provisions relate, not to the conduct of the member while piloting a ship, but to insuring an adequate rotating schedule, purely an administrative detail.

They make much of a provision providing for discipline of a pilot for drunkenness. This is the only by-law which even remotely supports plaintiffs' theory of control. While the provision undoubtedly acts as a deterrent against drunkenness when on duty, either off or on a ship, nevertheless, it is the State of Delaware through the Board of Pilot Commissioners, not the Association, which can revoke a pilot's license for drunkenness or other misconduct or misbehavior. Despite such a by-law, while aboard ship, a pilot's navigational discretion is absolute, subject always to the control and power to revoke his license which may be exercised by the State through the Board.

Plaintiffs' argument that the Association may refuse to permit the holder of a license to become a member does not distinguish this case from the others above cited. In Dampskibsselskabet Atalanta A/S v. United States, it clearly appears that the Association controlled membership in its own organization.

And while on this whole subject of control, it should not be overlooked that even in Guy v. Donald there was control of a sort (but not over the pilot in the performance of his duties while piloting) by the Virginia Pilot Association over its member pilots. There, the opinion at 203 U.S. at page 405, 27 S.Ct. at page 64 states:

"The rules of the board of commissioners provide for the appointment by them of a supervisory board from the pilot association, to report to the president of the board of commissioners all cases of insubordination, breach of rules, etc., or any misdemeanor, afloat or on shore, on the part of any member of the association."

\*   \*   \*   \*   \*   \*

" \*   \*   \* Thus substantially the whole government of the association is in the hands of the board."

But, at the risk of repetition, this is not the type of control which extends to the acts of a pilot while on the bridge piloting a ship up or down Delaware Bay and River. It is this latter type of control which is so clearly emphasized as the decisive test in Guy v. Donald and the long line of authorities above considered and which, equally clearly, is found lacking in the case at bar.

It is admittedly difficult to fit the defendant association and those like it into a legal pigeonhole. They are not partnerships. They are not joint ventures. The principle of respondeat superior is not applicable. It does no business except as an agent, has no income as an entity and is not required to pay income taxes as an association. Mobile Bar Pilots Association v. Commissioner of Internal Revenue, 97 F.2d 695 (C.A.5, 1938). One Court compared a similar association with a union hiring hall, saying:

"It is further the Court's opinion that respondent Foss Launch & Tug Company incorrectly contends that the Pilots Association, of which the pilot on the TERMINAL KNOT was a member, was an independent contractor and was acting through its pilot in directing the actions of the TERMINAL KNOT. It is true that the Pilots' Association was a sort of union organized and acting for the convenience of its members, including the pilot of the TERMINAL KNOT, in finding work for the individual Association mem-

bers, in providing facilities for them while going to and from their work, and in other ways supplying needful accommodations connected with the work of the individual members, but that activity of the Association, in my opinion, amounts to no more than the activity of the ordinary union in obtaining contracts and supplying various instruction and supervision services to union members in connection with the performance by individual union members of their assigned work. *The activities of the Pilot Association,* like the activities of the ordinary union respecting the individual work performance of individual union members, *does not put the organization itself,* whether it is a Pilots Association or the ordinary union, *in the business of the job to be done* and does not constitute the union the actor and performer of the work being done by the individual member." (Emphasis supplied.) O'Hare v. United States, 1950 A.M.C. 182 (W.D.Wash.)

Or, it may be loosely compared with groups of young lawyers who (and the Court takes judicial knowledge of the fact) frequently band together, not as a firm, but to reduce overhead by jointly renting office space, hiring secretaries, etc. But under no circumstances are the members of the group responsible for the acts of one of them because they exercise no control or direction whatever over each other's practice of the law.

But whatever it may be in law, the defendant association clearly lacks the power of control over its members while performing services as pilots. So far as can be gathered from the facts, the members are as independent in the performance of their duties as pilots today as they were 66 years ago when Judge McPherson, in dismissing the libel against it, said:

"He [Pilot] is not engaged in the business of the association, but is a licensee of the states of Delaware and Pennsylvania, respectively, and governed by the laws of said states, respectively, as to his conduct and acts as a pilot." *City of Dundee.*

There being no power of direction or control by the Association over its members while rendering their services as pilots, the Association is not liable and its motion for summary judgment must be granted.